UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

```
------------------------------------------------------------ X
                                             :
REBECCA MCCUTCHEON, et al.,                  :
                            Plaintiffs,      :
                                             :            16 Civ. 4170 (LGS)
           -against-                         :
                                             :        OPINION AND ORDER
COLGATE-PALMOLIVE CO., et al.,               :
                                             :
                            Defendants.      :
------------------------------------------------------------ X
```

LORNA G. SCHOFIELD, District Judge:

Plaintiff and class representative Rebecca McCutcheon[1] brings this action, on behalf of

herself and others similarly situated, under the Employee Retirement Income Security Act of

1974, 29 U.S.C. § 1001 et seq. ("ERISA"), against Defendants Colgate-Palmolive Co.

("Colgate"), Colgate-Palmolive Co. Employees' Retirement Income Plan (the "Plan"), Laura

Flavin, Daniel Marsili and the Employee Relations Committee of Colgate-Palmolive Co. (the

"Committee").  Defendants move for summary judgment on Counts I and II of the Complaint,

which allege, respectively, that Defendants failed to comply with ERISA and accompanying

regulations during the administrative phase of the case, and that Plaintiffs were wrongfully

denied residual annuity benefits under the Residual Annuity Amendment (the "RAA") and

incorporated Plan provisions.  Count I is not a class claim.  For the following reasons, summary

judgment is granted in part and denied in part to Defendants.

---

[1] The Plaintiffs are McCutcheon and her former husband, Paul Caufield.  Only McCutcheon is a
class representative.  She brings claims under Counts I and II.  Caufield seeks relief on Count II,
but not Count I.

## I.    BACKGROUND

Unless otherwise noted, the facts below are drawn from the record and, in general terms unless otherwise noted, are undisputed.[2]

### A.    History of the Plan

#### a.  Colgate-Palmolive Company and the Committee

Defendant Colgate is a global consumer products company and is the sponsor of the Plan. At all relevant times, Defendant Plan was an "employee pension benefit plan" and a defined benefit plan within the meaning of ERISA; Defendant Committee was the "plan administrator," and, along with non-party the Pension Fund Committee, was a "named fiduciar[y]" of the Plan. Defendants Daniel Marsili (Senior Vice President of Global Human Resources) and Laura Flavin (Vice President for Global Employee Compensation and Benefits) were members of the Committee.

#### b.  Conversion to Cash Balance Plan as of 1989

The Plan originally operated as a traditional defined benefit plan, which guaranteed that each member (or "Participant") receive an "accrued benefit" expressed as an annuity upon reaching "normal retirement age," here, age sixty-five.  Prior to July 1, 1989, the Plan determined the level of benefits using a final average pay formula (the "Grandfathered Formula"), based on a Participant's final average earnings and years of credited service. Participants received their Plan benefits *only* in the form of an annuity.

---

[2] Defendants argue that the Court should strike Plaintiffs Rule 56.1 Opposition because it violates the Court's Individual Rules and the Local Rules for the Southern District of New York. The Court declines to strike the Rule 56.1 Opposition in its entirety, but disregards any portion that is repetitive or contains argument, rather than "a separate, short and concise statement of additional material facts as to which it is contended that there exists a genuine issue to be tried." S.D.N.Y. Local Civ. R. 56.1(b).

The Plan was amended in 1994, effective as of July 1, 1989, and reflected the terms of the Plan in effect and applicable to all Class Members paid between July 1, 1989, and the effective date of the 2003 Plan, including Plaintiff.  Effective July 1, 1989, the Plan was converted to a cash balance plan.  As a cash balance plan, each Participant had a "cash balance" account called the Personal Retirement Account balance, which reflected a set percentage of yearly pay plus interest (the "PRA Formula").  Unlike the prior version of the Plan using the Grandfathered Formula, the cash balance plan allowed Participants to elect to receive their benefits either as a lump sum or an annuity beginning on the "benefit commencement date" (i.e., the first date of the first period when a Participant is paid).

Because the Plan is considered a defined benefit plan under applicable law, Internal Revenue Code ("IRC") § 417(e) and ERISA § 205(g) require any lump sum payment to be no less than the actuarial equivalent of the Participant's accrued benefit expressed as a single life annuity payable at normal retirement age.  I.R.C. § 417(e); ERISA § 205(g), 29 U.S.C. § 1055(g); *accord Esden v. Bank of Bos.*, 229 F.3d 154, 164 (2d Cir. 2000).  To determine actuarial equivalence, a plan administrator projects the cash balance forward to normal retirement age, converts that cash balance to an age sixty-five annuity and then converts that age sixty-five annuity to a lump sum and discounts back the lump sum to present value.  A plan can select a different rate to project the cash balance forward into an age sixty-five single-life annuity, but the discount rate to determine the present value of the accrued benefit (annuity) is prescribed by IRC § 417(e).  *See* I.R.C. § 417(e); *Esden*, 229 F.3d at 164.

For Class Members who, like McCutcheon, separated from service between 1989 and 2000, the Plan used a projection rate of the 20-year Treasury bill interest rate plus 1% ("20+1% rate").  This projection rate, used to convert the cash balance into an age sixty-five annuity (for

Participants younger than sixty-five), was dictated by § 1.3 of the Plan, which defined "Actuarial Equivalent." The discount rate to determine the present value of the accrued benefit (annuity) as prescribed by IRC § 417(e) at the time of the adoption of the Plan in 1989 until February 28, 2002, was a blend of interest rates equal to the Pension Benefit Guaranty Corporation ("PBGC") rate. I.R.C. § 417(e)(3)(A)(ii)(II) (current version at I.R.C. § 417(e)(3)(C)); I.R.S. Notice 87-20, 1987-1 C.B. 456 (Feb. 9, 1987). The 20+1% rate used by Defendants between 1989 and 2000 was consistently and substantially higher than the PBGC rate.

### c. Plan Appendices -- Preservation of Benefits Under Grandfathered Formula

When the cash balance plan and PRA Formula were adopted as of 1989, employees who were then still employed by Colgate were given the option to continue benefits under the Grandfathered Formula as set forth in Appendices A through D of the Plan. The Appendices offered protection to Participants, like McCutcheon, who worked at Colgate prior to 1989, remained employed after the conversion to the cash balance plan but had accrued benefits under the previous Grandfathered Formula. Under Appendix C, these Participants could elect to make contributions to maintain benefits accrued under the Grandfathered Formula. If a Participant elected to continue making these contributions, and did so until her separation from service, she would be entitled to her accrued benefit under the PRA Formula plus her contributions under the Grandfathered Formula, in the form of either a lump sum or an annuity.

### d. The Residual Annuity Amendment and 2005 Implementation

In 2004, it came to Colgate's attention that the lump sum payments that the Plan had been paying to Participants -- who continued making contributions to maintain Grandfathered Formula benefits -- were less than the Participants would have otherwise received had they elected to receive an annuity. On March 30, 2005, the Committee adopted the RAA to address

the potential unlawful forfeiture of benefits.

The RAA amended the Plan and granted a residual annuity (the "RAA Annuity") to any Participant who elected a lump sum payment upon separation, and whose age sixty-five single life annuity benefit otherwise payable to the Member under Appendices B, C or D, as applicable, (the "Grandfathered Benefit") was greater than the age sixty-five single life annuity actuarial equivalent of a Participant's lump sum payment (the "Age 65 AE of LS paid").  The amount of the RAA Annuity was the delta between the two amounts.   After the Committee adopted the RAA in 2005, it was implemented only for prospective retirees, i.e., those Participants who retired after March 2005, even though the RAA was effective as of July 1, 1989.  Retroactive implementation of the RAA did not occur at that time for Participants who had retired between July 1989 and February 2005, such as McCutcheon.

### e.  *Colgate I* Settlement and Retroactive Implementation of the RAA

In 2007, a class action was commenced on behalf of several thousand Participants against Colgate, alleging that their pension benefits had been miscalculated.  *See In re Colgate-Palmolive Co. ERISA Litig.* ("*Colgate I*")*, 36 F. Supp. 3d 344 (S.D.N.Y. 2014).  In May 2010, the parties in *Colgate I* reached an agreement in principle to settle that case.  Up to that point, counsel for the plaintiffs in *Colgate I* had not been aware of the RAA.  Once plaintiffs' counsel received a copy of the RAA in July 2011, all RAA-related claims were carved out of the settlement agreement.  The Court approved the final settlement agreement on July 8, 2014.

After the *Colgate I* settlement, Defendants retroactively applied the RAA, granting millions of dollars of additional annuity benefits to a few hundred Participants who had taken a lump sum payment between 1989 and 2005 and who had continued to make contributions under the Grandfathered Formula.  Defendants contend that all Participants entitled to an RAA

5

Annuity received one at that time.  Plaintiffs dispute this.

**B.      McCutcheon's Administrative Claim and Appeal**

McCutcheon was employed by Colgate from 1979 to 1994, and participated in the Plan during that time.  After the Plan converted in 1989, she continued to make contributions under the Grandfathered Formula until she resigned from the company at the age of thirty-seven in 1994.  She elected to receive her pension benefit as a lump sum distribution of $22,425.64.  She did not receive any benefit under the RAA when it was enacted in 2005.  On July 30, 2014, she submitted a claim letter to the Committee, stating that she was entitled to an RAA Annuity, in addition to the lump sum payment she had received in 1994.  She requested that Defendants begin paying her an RAA Annuity, and provide an explanation of how it was calculated.

Defendant Flavin responded on behalf of the Committee and denied McCutcheon's claim, by letter dated November 4, 2014.  Because her Grandfathered Benefit (calculated as $699.58) was less than her Age 65 AE of LS paid (calculated as $752.84), the Committee concluded that McCutcheon was not entitled an RAA Annuity.  On January 6, 2015, McCutcheon sent a letter to the Committee, requesting, among other things, certain documents, information and responses to questions described in the letter.  On March 5, 2015, Defendant Flavin responded to McCutcheon on behalf of the Committee, attaching some, but not all, of the documents McCutcheon had requested.

McCutcheon formally appealed the Committee's benefit denial decision in a letter dated April 6, 2015, identifying four errors ("Errors") that the Committee allegedly committed in the course of calculating her RAA Annuity.  The four Errors are the basis for the denial of benefits claim in Count II and are discussed in detail below.  The April 6, 2015, letter also noted that Defendants had not adequately responded to the "39 specific requests for documents, records

6

and/or information" made in McCutcheon's January 6, 2015, letter, and again requested that Defendants "respond to those contentions, answer those questions, and fully comply with those requests . . . so as to prevent further prejudice to [McCutcheon]."

On June 4, 2015, in a sixteen-page letter signed by Defendant Marsili, the Committee denied McCutcheon's appeal.  In a March 14, 2016, letter from McCutcheon to the Committee, she again raised the Committee's failure to respond adequately to her prior request for documents.  On April 25, 2016, the Committee provided four additional documents.

### C.    Relevant Procedural History

McCutcheon commenced this action on June 3, 2016, asserting five causes of action. The Magistrate Judge overseeing pre-trial proceedings bifurcated the case and ordered only Counts I and II to proceed.  On July 27, 2017, the Court granted Plaintiffs' motion for class certification as to Count II and appointed McCutcheon as class representative of a class consisting of:

> any person who, under any of Appendices B, C or D of the Plan, is entitled to a greater benefit than his or her Accrued Benefit as defined in Plan § 1.2, provided such person received a lump sum payment from the Plan, and the beneficiaries and estates of any such person.

*Caufield v. Colgate-Palmolive Co.*, No. 16 Civ. 4170, 2017 WL 3206339, at *8 (S.D.N.Y. July 27, 2017).  Given this class definition, each Class Member (1) was a Colgate employee in July 1989 who elected to continue making contributions under the Grandfathered Formula as set forth in Appendices A through D of the Plan until separating from the company, (2) received a lump sum payment from the Plan in the amount of his or her accrued benefit plus contributions under the Grandfathered Formula upon separation and (3) is entitled to a greater benefit than his or her Accrued Benefit as defined in Plan § 1.2, which defines Accrued Benefit in part as the "Actuarial

7

Equivalent of the Member's Account."  Plaintiffs estimate that the Class consists of approximately 1,200 individuals, *id*. at *4, with claims totaling approximately $300,000,000. Defendants now seek summary judgment on Counts I and II.[3]

## II.   LEGAL STANDARD

Summary judgment is appropriate if the record establishes that there is no "genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  "A genuine issue of material fact exists if 'the evidence is such that a reasonable jury could return a verdict for the nonmoving party.'"  *Nick's Garage, Inc. v. Progressive Cas. Ins. Co.*, 875 F.3d 107, 113 (2d Cir. 2017) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)).  The moving party "bears the burden of 'demonstrat[ing] the absence of a genuine issue of material fact.'"  *Id.* at 114 (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986)) (alteration in original).  The evidence is construed in the light most favorable to, and all reasonable inferences are drawn in favor of, the nonmoving party.  *Id.* at 113.  "Summary judgment should be denied where there are genuine issues of material fact 'that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party.'"  *Davis-Garett v. Urban Outfitters, Inc.*, 921 F.3d 30, 45 (2d Cir. 2019) (quoting *Anderson*, 477 U.S. at 250).

## III.   DISCUSSION

### A.   Alleged Failure to Produce Documents and Information -- Count I and Standard of Review on Count II

---

[3] After the current motion was fully briefed, on October 24, 2019, Plaintiffs filed a letter motion seeking a pre-motion conference and permission for leave to file a surreply.  The Court denied Plaintiffs' request to file a surreply, and stated that it would consider whether to accept the letter motion as a surreply when the motion was adjudicated.  The surreply was considered in connection with this decision and nothing in the surreply affected the outcome.

### 1.   The Administrative Procedure Claim (Count I)

Count I alleges that Defendants[4] violated 29 U.S.C. § 1133(a)(2) by violating portions of

the ERISA Procedures Regulation, 29 C.F.R. § 2560.503-1, by failing to produce all relevant

documents and information during McCutcheon's claim and appeal.  Count I seeks relief in the

form of an order "to permit Plaintiffs to review all relevant documents, records and other

information forthwith."  Summary judgment is granted to Defendants on Count I on the ground

of mootness because the material at issue was produced during the course of the litigation.  *See*

*Martin-Trigona v. Shiff*, 702 F.2d 380, 386 (2d Cir. 1983) ("The hallmark of a moot case or

controversy is that the relief sought can no longer be given or is no longer needed."); *accord*

*Krull v. Oey*, 805 F. App'x 73, 74 (2d Cir. 2020) (summary order).

### 2.   The Standard of Review on the Denial of Benefits Claim (Count II)

Plaintiffs relatedly argue that the de novo standard of review applies to the denial of

benefits claim (Count II) because Defendants violated the ERISA Procedures Regulation, by

failing to produce relevant documents and information, as well as by failing to explain the

specific reasons and specific plan provisions upon which the denial of her claim was based.

---

[4] Defendants argue that the Committee is the only proper defendant for Counts I and II because it was appointed as the plan administrator, granted discretionary authority to determine benefits, provided documents and made final, binding decisions on appeals.  This argument is unpersuasive.  ERISA authorizes claims under 29 U.S.C. § 1132(a)(1)(B) against the plan, administrators and fiduciaries.  *See Paneccasio v. Unisource Worldwide, Inc.*, 532 F.3d 101, 108 n.2 (2d Cir. 2008) ("A claim for recovery of benefits under ERISA . . . can be brought only against a covered plan, its administrators or its trustees."); *accord Romero v. Teamsters Union Local 272*, No. 15 Civ. 7583, 2019 WL 4688642, at *7 (S.D.N.Y. Sept. 25, 2019).  Defendants Flavin and Marsili are each members of the Committee, which is itself a named fiduciary and defined according to the positions by which it is composed, and Colgate is the sponsor of the Plan.  Accordingly, all Defendants are appropriately named in Counts I and Count II.  *See* ERISA § 402(a)(2), 29 U.S.C. § 1102(a)(2); ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A).

For the following reasons, the Court agrees that Defendants failed to produce documents and information, and finds that McCutcheon's claim in Count II is subject to a de novo standard of review but that the same claim on behalf of Class Members is subject to the more deferential "arbitrary and capricious" standard. This is more of a theoretical than an actual difference as Errors 1 and 2 are resolved based on the unambiguous language of the Plan, *see O'Neil v. Ret. Plan for Salaried Employees of RKO Gen., Inc.*, 37 F.3d 55, 59 (2d Cir. 1994); Error 3 centers on a question of law, as to which the de novo standard applies, *see Wilkins v. Mason Tenders Dist. Council Pension Fund*, 445 F.3d 572, 581 (2d Cir. 2006); and only Error 4 is subject to the arbitrary and capricious standard as regards the Class.

### a.   Applicable Law to Determine Standard of Review for Denial of Benefits Claim

Although "ERISA does not set out the appropriate standard of review for actions under § 1132(a)(1)(B) challenging benefit eligibility determinations," in *Firestone*, the Supreme Court held that "a denial of benefits challenged under § 1132(a)(1)(B) is to be reviewed under a *de novo* standard unless the benefit plan gives the administrator or fiduciary discretionary authority to determine eligibility for benefits or to construe the terms of the plan," in which case an arbitrary and capricious standard applies. *Firestone Tire & Rubber Co. v. Bruch,* 489 U.S. 101, 109, 115 (1989); *accord Halo v. Yale Health Plan, Dir. of Benefits & Records Yale Univ.*, 819 F.3d 42, 51 (2d Cir. 2016). An administrator's decision will be overturned as "arbitrary and capricious" only when the decision is "without reason, unsupported by substantial evidence or erroneous as a matter of law." *Roganti v. Metro. Life Ins. Co.*, 786 F.3d 201, 211 (2d Cir. 2015); *accord Cohen v. Liberty Mut. Grp. Inc.*, 380 F. Supp. 3d 363, 384 (S.D.N.Y. 2019). However, even when a plan confers discretionary authority to the plan administrator, de novo review

applies when a plan "fail[s] to comply with the claims-procedure regulation in the processing of a participant claim [unless the failure] was inadvertent *and* harmless."  *Halo*, 819 F.3d at 58; *accord Cohen*, 380 F. Supp. 3d at 376-77.  The plan "bears the burden of proof on this issue since the party claiming deferential review should prove the predicate that justifies it."  *Halo*, 819 F.3d at 58; *accord Cohen*, 380 F. Supp. 3d at 379.

### 2.    Application of Law Dictates Different Standards of Review for McCutcheon and the Class, Except as to Questions of Law

The express terms of Section 8.4(a) confer discretionary authority to the Committee to determine benefits eligibility and construe the terms of the Plan.

> [The Committee] shall have such duties and powers as may be necessary to discharge its duties hereunder, including, but not by way of limitation . . . [t]he exclusive right to construe and interpret (i) the terms or provisions of the Plan . . . or (ii) the applicability of any of the terms or provisions of the foregoing in a particular situation, or (iii) all questions of eligibility and determine the amount, manner and time of payment of any benefits hereunder; to exercise discretion where necessary or appropriate in the interpretation and administration of the Plan; and to decide any and all matters arising thereunder.

*See, e.g.*, *Tocker v. Philip Morris Cos., Inc.*, 470 F.3d 481, 487 (2d Cir. 2006) (concluding the same where plan language stated that the committee "shall have all powers reasonably necessary to administer the Plan and is authorized, in accordance with its provisions, to determine eligibility, to compute and determine benefits, and to determine individual rights and privileges under the Plan").  But de novo review nevertheless applies, at least with respect to McCutcheon, because Defendants did not comply with the ERISA Procedures Regulation.

Under 29 C.F.R. § 2560.503-1(h)(2)(iii), claimants must be "provided, upon request and free of charge, reasonable access to, and copies of, *all* documents, records, and other information relevant to the claimant's claim for benefits," subject to the definition of relevance in 29 C.F.R. § 2560.503-1(m)(8).  29 C.F.R. § 2560.503-1(h)(2)(iii) (emphasis added).  29 C.F.R. §

2560.503-1(m)(8) states that a document, record or other information shall be considered

"relevant" to an administrative claim if it was either:

> (i) . . . relied upon in making the benefit determination; (ii) . . . submitted, considered, or generated in the course of making the benefit determination, without regard to whether such document, record, or other information was relied upon in making the benefit determination; (iii) [or] [d]emonstrates compliance with the administrative processes and safeguards required pursuant to paragraph (b)(5) of this section in making the benefit determination.

> 29 C.F.R. § 2560.503-1(m)(8).

29 C.F.R. § 2560.503-1(b)(5) states that a plan's claim procedures are reasonable only if they

"contain administrative processes and safeguards designed to ensure and to verify that benefit

claim determinations are made in accordance with governing plan documents and that, where

appropriate, the plan provisions have been applied consistently with respect to similarly situated

claimants."  29 C.F.R. § 2560.503-1(b)(5).

In addition to failing to respond fully to the thirty-nine specific requests contained in the

January 6, 2015, letter during the course of McCutcheon's claim and appeal, Plaintiffs argue that

Defendants withheld the following relevant documents -- generated, considered and/or relied

upon by Defendants in denying her claim and appeal -- and that Plaintiffs were able to learn of

and obtain these documents only in the course of discovery: (1) documents relating to the

Committee's February 2014 action adopting the PBGC rate for purposes of converting a

Participant's PRA lump sum payment into the Age 65 AE of the LS paid; (2) documents relating

to Defendants' actual calculations of McCutcheon's RAA eligibility, contained within an Excel

spreadsheet created as part of the 2014 retroactive implementation of the RAA, which

Defendants referenced in the letter denying McCutcheon's appeal; (3) a 2014 RAA manual

outlining relevant calculation methodology and procedures, which Defendants identified as a

guide on how to identify Participants entitled to the RAA and how to calculate RAA Annuities, and which Defendants contend shows that the Plan calculated McCutcheon's eligibility for the RAA in the same way as other Participants; (4) spreadsheets and related benefit files of Participants similarly situated to McCutcheon; (5) an initial internal memorandum analyzing McCutcheon's April 2015 appeal; and (6) an internal draft response to the January 6, 2015, letter, discussing and directly addressing many of McCutcheon's document and information requests even though those responses were never shared with her during the claims process.[5]

These documents are "relevant" under the definition in 29 C.F.R. § 2560.503-1(m)(8), as documents (1) relied upon by Defendants in denying McCutcheon's claim, (2) submitted, considered or generated in the course of making her benefit determination or (3) demonstrating compliance with the administrative processes and safeguards stated in 29 C.F.R. § 2560.503-1(b)(5), such as showing that the relevant Plan provisions have been applied consistently with respect to similarly situated Participants. *See, e.g.*, *Thoma v. Fox Long Term Disability Plan*, No. 17 Civ. 4389, 2018 WL 6514757, at *26 (S.D.N.Y. Dec. 11, 2018) (identifying documents relating to defendant's internal policies as relevant under 29 C.F.R. § 2560.503-1(h)(2)(iii), as showing whether the claims procedure was applied consistently); *Mohamed v. Sanofi-Aventis Pharm.*, No. 06 Civ. 1504, 2009 WL 4975260, at *12 (S.D.N.Y. Dec. 22, 2009) (identifying as relevant under 29 C.F.R. § 2560.503-1(h)(2)(iii) copies of policies plaintiff was alleged to have violated, performance evaluations, documents relating to the at-issue unauthorized purchase orders and emails between plaintiff and other employees).

---

[5] These documents were finally produced during the course of discovery, in response to RFP No. 6, which sought "all documents constituting the 'robust administrative record, which shows how thoroughly the Plan analyzed [McCutcheon's] claim.'"

Because the documents identified above are relevant and were provided to McCutcheon for the first time during this litigation, this is sufficient to show a violation of 29 C.F.R. § 2560.503-1(h)(2)(iii).[6]  *See Thoma*, 2018 WL 6514757, at *26 (concluding the same where certain documents requested by plaintiff -- and relevant to a consideration of whether the claims procedure was applied consistently -- were not provided until discovery); *Mohamed*, 2009 WL 4975260, at *12 (same).

Defendants dispute the relevance of the documents Plaintiffs identify, to the extent that Plaintiffs have not shown that the documents were provided to, relied upon or generated by the Committee, and argue that they complied with the ERISA Procedures Regulation by providing 1,200 pages of documents during the course of McCutcheon's claim and appeal.  Defendants misread what 29 C.F.R. § 2560.503-1(h)(2)(iii) requires, as the definition of relevance is broad, and the regulation does not require Plaintiffs to show explicitly the documents were relied upon by the Committee.[7]  *Compare Salisbury v. Prudential Ins. Co. of Am.*, 238 F. Supp. 3d 444, 449

---

[6] Defendants argue that the documents identified by McCutcheon were already in her possession before the current case was filed, citing a footnote in Plaintiffs' memorandum in response to Defendants' objections to an October 19, 2017, discovery order.  However, the footnote compels the opposite conclusion, as Plaintiffs state that "Defendants' repeated suggestion . . . that they have already produced documents pursuant to . . . Plaintiffs' RFP Nos. 2-6 is incorrect and misleading," noting that "the vast majority of [documents produced by Defendants] . . . comprise *multiple* copies of claim and appeal correspondence and attachments . . . which Plaintiffs *explicitly excluded* from their requests."  (emphasis added).  Nowhere in the footnote do Plaintiffs -- as Defendants suggest -- admit they were provided the *specific* documents identified above.

[7] Defendants cite *Glista v. Unum Life Ins. Co. of Am.*, 378 F.3d 113 (1st Cir. 2004) for the proposition the documents identified by Plaintiffs are not relevant because they were not "generated or adopted by the plan administrator" nor "were [the documents] known or should have been known by those who made the decision to deny the claim."  *Id.* at 123.  Defendants both misread and misuse *Glista*, as the court there concluded the documents identified by plaintiff *were relevant* to the interpretation of other plan documents, and noted that "[t]he fact that [the plan appeals consultant] does not remember if she actually relied on [the documents

14

(S.D.N.Y. 2017) ("[I]f the plan administrator does not *strictly* comply with the Department of Labor's regulations" then de novo review applies. (emphasis added)), *with Russo v. Cont'l Cas. Co.*, No. 05 Civ. 5700, 2006 WL 931683, at *5 (S.D.N.Y. Apr. 11, 2006), *aff'd*, 214 F. App'x 7 (2d Cir. 2007) (finding no violation of 29 C.F.R. § 2560.503-1(h)(2)(iii) where, upon request, plaintiff was sent "a *complete* copy of the administrative record." (emphasis added)).

Additionally, Defendants separately violated 29 C.F.R. § 2560.503-1(g)(1)(i) and (ii) by failing to set forth in McCutcheon's claim denial letter -- "in a manner calculated to be understood by the claimant" -- "[t]he specific reason or reasons for the adverse determination" and "[r]eference to the specific plan provisions on which the determination is based."  29 C.F.R. § 2560.503-1(g)(1)(i)-(ii).  While the claim denial letter identifies some information related to the RAA and includes a basic explanation of the relevant RAA calculations, the letter provides no reference to the specific Plan provisions -- apart from the RAA, Appendix C and Appendix F mortality rates -- upon which denial was based; fails to explain why the Grandfathered Benefit used to calculate the RAA was $699.58, when the same benefit was calculated as $1,125.38 when McCutcheon separated from service in 1994; and fails to identify which Plan provision defined the "PBGC interest rates," among other omissions.  *See Montefiore Med. Ctr. v. Local 272 Welfare Fund*, No. 09 Civ. 3096, 2019 WL 571455, at *3 (S.D.N.Y. Jan. 25, 2019), *report and recommendation adopted*, No. 09 Civ. 3096, 2019 WL 569805 (S.D.N.Y. Feb. 12, 2019) (finding a violation of 29 C.F.R. § 2560.503-1(g)(1), in part, where none of the explanation of

---

identified by plaintiff as relevant] in evaluating [plaintiff's] claim does not undercut [the documents'] relevance."  *Id*. at 124-25.  Defendants also overlook this Court's motion to dismiss decision, stating that similar materials would be relevant under 29 C.F.R. § 2560.503-1(m)(8), "even if they ultimately were not relied upon."  *See Caufield v. Colgate-Palmolive Co.*, No. 16 Civ. 4170, 2017 WL 744600, *8 (S.D.N.Y. Feb. 24, 2017).

benefits forms referenced a specific plan provision); *Babino v. Gesualdi*, 278 F. Supp. 3d 562, 584 (E.D.N.Y. 2017), *aff'd*, 744 F. App'x 30 (2d Cir. 2018) (finding a violation of 29 C.F.R. § 2560.503-1(g)(1) where the claim denial failed to reference the specific plan provision upon which defendants relied in calculating plaintiff's pension benefits).  Further, Plaintiffs have cited evidence, including Defendant Flavin's testimony, that McCutcheon's claim was denied based on the 2010 Plan document, rather than the operative 1994 Plan, and that Defendant Flavin signed the claim denial letter without "hav[ing] in mind . . . [the] obligation to provide all the reasons for the denial in the letter."

Defendants argue, in the alternative, that even if they did violate the ERISA Procedures Regulation, Plaintiffs have failed to identify any actual prejudice caused by a violation. "[In *Halo*] the Second Circuit was careful to circumscribe [this] exception to 'prevent the exception from swallowing the rule,' and it directed that deviations from the ERISA Procedures Regulation 'should not be tolerated lightly[,]' and that a noncompliant plan 'bears the burden of proof on [showing a failure to comply with the ERISA Procedures Regulation was inadvertent and harmless].'"  *Cohen*, 380 F. Supp. 3d at 379 (quoting *Halo*, 819 F.3d at 57-58) (third alteration in original).

Here, the ERISA Procedures Regulation violations are not analogous to the exceptions envisioned in *Halo*, "such as responding one hour or one day late, where such delays do not harm the claimant in a[ny] material way."  *Id.* (concluding the same where defendant's denial of benefits letter provided only vague reasons for the denial and did not identify the relevant provisions of the plan).  And contrary to Defendants' assertion that *Plaintiffs* have failed to identify prejudice, it is Defendants' burden to show that a violation of the ERISA Procedures Regulation was inadvertent and harmless.  *See Halo*, 819 F.3d at 58; *Aitken v. Aetna Life Ins.*

16

*Co.*, No. 16 Civ. 4606, 2018 WL 4608217, at *14 (S.D.N.Y. Sept. 25, 2018) (concluding that the *Halo* exception did not apply because defendant did not show that the violation was inadvertent). Here Defendants have failed to show both.  Accordingly, McCutcheon's claim in Count II is subject to a de novo standard of review (except as qualified below).

Defendants' violation of the ERISA Procedures Regulation affects the standard of review only for McCutcheon's denial of benefits claim, since Count I is solely an individual claim and is not asserted on behalf of the putative Class.  Because the Plan confers discretionary authority to the Committee to determine benefits eligibility and construe the terms of the Plan, a claim asserted by any other Participant is afforded a deferential standard of review (again except as qualified below) because no other participant has established a violation of the ERISA Procedure Regulation.

## B.    Denial of Benefits Claim (Count II)

Plaintiffs' denial of benefits claim in Count II is based on four alleged Errors Defendants made when interpreting and calculating benefits under the RAA.  For the following reasons, summary judgment is granted in part and denied in part to Defendants on Errors 1 through 4.

### a.   Error 1

As Error 1, Plaintiffs assert that Defendants miscalculated the RAA benefit, causing an impermissible forfeiture of benefits by Class Members.  For the following reasons, summary judgment is denied to Defendants on Error 1 under both a de novo standard and arbitrary and capricious standard, because Defendants' interpretation is erroneous as a matter of law.

#### 1.   Legal Principles for Construing a Plan

When a plan is construed in ERISA cases involving claims under § 1132(a)(1)(B), courts interpret the plan according to "federal common law," which is "largely informed by state law

principles." *Lifson v. INA Life Ins. Co. of New York*, 333 F.3d 349, 352-53 (2d Cir. 2003);

*accord Stets v. Securian Life Ins. Co.*, No. 17 Civ. 09366, 2020 WL 1467395, at *5 (S.D.N.Y.

Mar. 25, 2020).  Courts first look to determine if the Plan's terms are ambiguous.  *See O'Neil*, 37

F.3d at 58-59; *accord Verdier v. Thalle Constr. Co., Inc.*, No. 14 Civ. 4436, 2017 WL 78512, at

*4 (S.D.N.Y. Jan. 5, 2017), *aff'd*, 771 F. App'x 20 (2d Cir. 2019).  "Whether ERISA plan

language 'is ambiguous is a question of law that is resolved by reference to the contract alone.'"

*Strom v. Siegel Fenchel & Peddy P.C. Profit Sharing Plan*, 497 F.3d 234, 244 n.6 (2d Cir. 2007)

(quoting *O'Neil*, 37 F.3d at 59); *accord Verdier*, 2017 WL 78512, at *4.  "Language is

ambiguous when it is capable of more than one meaning when viewed objectively by a

reasonably intelligent person who has examined the context of the entire integrated agreement."

*Strom*, 497 F.3d at 244 n.6 (internal quotation marks omitted); *accord Verdier*, 2017 WL 78512,

at *4.

        If the terms of the Plan are unambiguous, they are enforced according to their terms.

"Where . . . plan language categorically states that certain benefits will be provided, *de*

*novo* review is appropriate because unambiguous language leaves no room for the exercise of

discretion."  *O'Neil*, 37 F.3d at 59; *accord Strom*, 497 F.3d at 244 n.6 ("[U]nambiguous

language in an ERISA plan must be interpreted and enforced in accordance with its plain

meaning.").  The court is to "review the Plan as a whole, giving terms their plain meanings."

*Fay v. Oxford Health Plan*, 287 F.3d 96, 104 (2d Cir. 2002); *accord Jarosz v. Am. Axle & Mfg.,*

*Inc.*, 372 F. Supp. 3d 163, 178 (W.D.N.Y. 2019); *see Brass v. Am. Film Techs., Inc.*, 987 F.2d

142, 148 (2d Cir. 1993) ("Where the [contract] language is plain and unambiguous, a court may

construe the contract and grant summary judgment.").

If the terms of the Plan are ambiguous, the denial of benefits is considered under the arbitrary and capricious standard where the party making the interpretation has discretion to interpret the terms.  *O'Neil*, 37 F.3d at 59; *accord Jarosz*, 372 F. Supp. 3d at 175.  A denial of benefits is "arbitrary and capricious only if the decision is without reason, unsupported by substantial evidence or erroneous as a matter of law."  *Fay*, 287 F.3d at 104 (internal quotation marks omitted); *accord Jarosz*, 372 F. Supp. 3d at 175.  "'[W]here the trustees of a plan . . . interpret the plan in a manner inconsistent with its plain words, or by their interpretation render some provisions of the plan superfluous, their actions may well be found to be arbitrary and capricious.'"  *DeCesare v. Aetna Life Ins. Co.*, 95 F. Supp. 3d 458, 481 (S.D.N.Y. 2015) (quoting *O'Shea v. First Manhattan Co. Thrift Plan & Tr.*, 55 F.3d 109, 112 (2d Cir. 1995)).  But where both the interpretation proffered by the administrator and the interpretation proffered by the claimant are reasonable, the administrator's interpretation will not be disturbed.  *Novella v. Westchester Cty.*, 661 F.3d 128, 140 (2d Cir. 2011); *accord Jarosz*, 372 F. Supp. 3d at 175.

"It is axiomatic that where the language of a contract [at issue in a § 1132(a)(1)(B) claim] is unambiguous, the parties' intent is determined within the four corners of the contract, without reference to external evidence."  *Feifer v. Prudential Ins. Co. of Am.*, 306 F.3d 1202, 1210 (2d Cir. 2002); *accord Halpern v. Blue Cross/Blue Shield of W. New York*, No. 12 Civ. 407, 2014 WL 4385759, at *10 (W.D.N.Y. Sept. 4, 2014); *Brooks v. Macy's, Inc.*, No. 10 Civ. 5304, 2011 WL 1793345, at *2 (S.D.N.Y. May 6, 2011).  By contrast, when a plan's terms are ambiguous, "an employer is entitled to summary judgment if it presents extrinsic evidence sufficient to remove the ambiguity and that evidence is not contradicted by opposing evidence."  *Gilbert v. Related Mgmt. Co., L.P.*, No. 95 Civ. 9610, 1998 WL 99801, at *4 (S.D.N.Y. Mar. 4, 1998), *aff'd sub nom.*, 162 F.3d 1147 (2d Cir. 1998) (collecting cases).

19

## 2.  Construing the RAA

In broad terms, Error 1 involves how to determine who is entitled to an RAA Annuity benefit, and the amount of any such benefit.  Defendants seek summary judgment, arguing that eligibility and the amount are determined by comparing the PRA lump sum payment Age 65 AE of LS paid (defined above as the "Age 65 actuarial equivalent of the lump sum paid") with the Grandfathered Benefit.  Plaintiffs oppose, arguing that the determination is made by comparing the Age 65 AE of LS paid with the <u>greater of</u> the Grandfathered Benefit <u>or</u> the Actuarial Equivalent of the Member's Accrued Benefit plus Contributions.  All agree that if the Age 65 AE of LS paid is smaller than the second amount, then the difference is the RAA Annuity benefit.  Based on a plain reading of the RAA, Plaintiffs have the better argument.

The RAA states, regarding eligibility to receive the RAA Annuity, that

> [e]ffective as of July 1, 1989, a Member who, under any of Appendices B, C or D, is entitled to a greater benefit than [her] Accrued Benefit . . . and who chooses to receive [her] benefit under this Lump Sum Payment Option, which is the Actuarial Equivalent of [her] Accrued Benefit . . . shall receive in addition to such lump sum payment an additional benefit, commencing at the same time and payable in the standard form applicable to such Member . . . . A Member may not elect any other form of payment option with respect to this additional benefit.

(Dkt. No. 21-3 at 4/8).  But the following provision of the RAA directs how to compute the RAA Annuity:

> Such additional benefit shall be computed by subtracting the age 65 single life annuity Actuarial Equivalent amount of the Member's lump sum payment [i.e., the Age 65 AE of LS paid] from *the age 65 single life annuity benefit otherwise payable to the Member under Appendices B, C or D, as applicable* . . . .

(Dkt. No. 21-3 at 4/8) (emphasis added).

The parties agree that Appendix C § 2(b) is the Appendix applicable to McCutcheon.  It states:

> If [she] elects to receive an annuity settlement instead of a single lump sum payment, [she] shall be eligible for an annuity pursuant to Section 6.2 . . . , Section

6.3 . . . or Section 6.4(a)(ii) . . . of the Plan that provides for [her] to receive *the larger of*:

(i)       the benefit that [she] would have received had [she] continued under the Plan as in effect prior to July 1, 1989, pursuant to Appendix B . . . or

(ii)      the benefit payable pursuant to Section 6.2 . . . Section 6.3 . . . or Section 6.4(a)(ii) . . . of the Plan, which is the Actuarial Equivalent of the Member's Accrued Benefit . . . plus [her] Contributions to Maintain Prior Plan Benefits with interest . . . at [her] Benefit Commencement Date.

(Dkt. No. 21-10 at 18-19/71). Defendants argue that only § 2(b)(i) (which is the Grandfathered Benefit) should be compared to the Age 65 AE of LS paid. Plaintiffs argue that the *greater* of § 2(b)(i) (the Grandfathered Benefit) *or* § 2(b)(ii) above should be compared to the Age 65 AE of LS paid.

The Plan plainly states that Participants are entitled "to receive the larger of" the two amounts, paragraph (i) the Grandfathered Benefit, and paragraph (ii) another amount discussed below. The Plan unambiguously directs that both amounts must be considered, as Plaintiffs assert. Defendants' interpretation to the contrary is erroneous as a matter of law.

Defendants agree that the language governing determination of the RAA Annuity payments is clear and unambiguous, but argue that the RAA dictates a comparison between the PRA lump sum payment (expressed as an annuity) and the Grandfathered Formula annuity only. Defendants assert that "the age 65 single life annuity benefit *otherwise payable* to the Member under Appendices B, C or D, as applicable" refers only to the Grandfathered Benefit. The other benefit, in Appendix C § 2(b)(ii), they argue is not "otherwise payable" because it is the same as the PRA lump sum payment, which was already paid.

This argument is unpersuasive because the PRA lump sum is not the same as the Appendix C § 2(b)(ii) benefit. The PRA lump sum is more precisely "the age 65 single life

21

annuity Actuarial Equivalent amount of the Member's lump sum payment" (i.e., the Age 65 AE of LS paid) from the RAA.  That amount is different from "the benefit payable pursuant to Section 6.2 . . . Section 6.3 . . . or Section 6.4(a)(ii) . . . of the Plan, which is the Actuarial Equivalent of the Member's Accrued Benefit . . . plus [her] Contributions to Maintain Prior Plan Benefits with interest" from Appendix C § 2(b)(ii).

First, on the most basic level, the words are different, suggesting that the drafters of the Plan meant to indicate two different things.  Second, the Age 65 AE of the LS paid is a computational construct created to facilitate the computation under the RAA.  It is not a Plan benefit; there is no such benefit in the Plan.  In contrast, Appendix C § 2(b)(ii) creates by its terms an actual Plan benefit, established when the Plan was converted from a defined benefit plan to a PRA cash balance plan.

Third, a critical difference that flows from this distinction, and the reason the amounts are not the same, is that they are based on different interest rate assumptions.  The Age 65 AE of the LS paid is based on a PBGC interest rate, while the Appendix C § 2(b)(ii) benefit is based on the higher 20+1% rate.  The Age 65 AE of the LS paid is based on a PBGC interest rate because, at the time of the adoption of the Plan in 1989, until February 28, 2002, the interest rates that IRC § 417(e) required plans to use in present valuing benefits were a blend of interest rates equal to the PBGC rate for immediate or deferred annuities.  I.R.C. § 417(e)(3)(A)(ii)(II) (current version at I.R.C. § 417(e)(3)(C)); I.R.S. Notice 87-20, 1987-1 C.B. 456 (Feb. 9, 1987).  Defendants admit in their reply memorandum that the Committee "uses the PBGC rates to convert the PRA Formula lump sum into an annuity for purposes of comparison with the Grandfathered Formula annuity."

In contrast, the Appendix C § 2(b)(ii) benefit, which is an actual benefit, is based on the

higher 20+1% rate because that is the interest rate assumption that Defendants actually used (for Participants paid before January 1, 2000) to project to an age sixty-five account value and then convert it to an age sixty-five annuity.  As reflected in the 2003 Plan document, the Plan required the use of 20+1% rate to convert a Participant's Account into a single life annuity in § 1.3, before the year 2000.  Throughout the relevant period, this rate was always greater -- i.e., not the same as -- the PBGC rates.

Defendants' argument in response falls short.  They assert that the Age 65 AE of LS paid and Appendix C § 2(b)(ii) benefit are one and the same.  They do not explain how this can be, given that the two amounts are based on different interest rates, nor do they appear to challenge that they use the PBGC rate for the former, and the 20+1% rate for the latter.  Defendants also cite evidence to show that the RAA's purpose and intent was to ensure that Participants were "made whole" by comparing their Age 65 AE of LS paid *just* to the Appendix C § 2(b)(i) Annuity Benefit (to preserve the Grandfathered Formula benefit).  They similarly argue that the Committee's past practice is consistent with their interpretation.  But the unambiguous language of the RAA and Appendix C forecloses consideration of extrinsic evidence such as intent and purpose or past practice.  *See Aeronautical Indus. Dist. Lodge 91 of Int'l Ass'n of Machinists & Aerospace Workers, AFL-CIO v. United Techs. Corp., Pratt & Whitney*, 230 F.3d 569, 576 (2d Cir. 2000) ("Only when provisions are ambiguous may courts look to extrinsic factors . . . such as bargaining history, past practices, and other provisions . . . to interpret the language in question."); *DeVito v. Hempstead China Shop, Inc.*, 38 F.3d 651, 654 (2d Cir. 1994) (noting that "[t]o the extent that [an] *ambiguity exists*, a textual analysis of the Agreement may be supplemented by an exploration of extrinsic evidence concerning the parties' intent" (emphasis added)).  Accordingly, Defendants are denied summary judgment on Error 1.

23

### b. Error 2

In Error 2, Plaintiffs argue that Defendants used the wrong Plan provision to determine the Estimated Primary Insurance Amount ("PIA") when calculating benefits under the Grandfathered Formula. Summary judgment is granted to Defendants with respect to Error 2.

The Appendix C § 2(b)(i) Annuity Benefit (i.e., the Grandfathered Benefit) references Appendix B. Appendix B § 2(a) states that Participants shall be entitled to receive a monthly retirement income "commencing on [her] Normal Retirement Date" equal to: "1.8% of [her] Average Recognized Monthly Earnings multiplied by [her] years of Benefit Accrual Service (with adjustment for completed months)" minus

> 1.25% of [her] monthly Estimated [PIA] under the Federal Social Security Act in effect at the time of the Member's retirement multiplied by [her] years of Benefit Accrual Service (with adjustment for completed months) after the attainment of age 25, but not in excess of 40 such years.

"Estimated Primary Insurance Amount" is defined in Appendix A § 7 as "the amount that is estimated to be paid to a [Participant] under the Federal Insurance Contribution Act . . . in effect upon the date of termination of employment." Section 7 requires calculation of this amount "using an administrative procedure established by [Colgate]" using either of two alternate sets of "principles" depending on where the Participant is working when she retires. Section 7(a) governs Participants "who elect[] to retire directly from the employment of [Colgate]." Section 7(b) governs Participants "who [are] not in the active employment of [Colgate] . . . immediately prior to [her] Benefit Commencement Date."

As expressed in Appendix B § 2(a), the PIA creates an offset in the target level of retirement income that reflects the estimated income a person will receive from Social Security. Section 7(a), for Participants who retire directly from Colgate, carries the assumption that no

24

compensation is earned after termination until retirement age for Social Security (age sixty-two).

Section 7(b), for Participants who are not employed by Colgate immediately prior to the Benefit

Commencement Date, carries the assumption that all future earnings remain level until the year

prior to age sixty-two.  Based on these assumptions, the PIA offset calculated under § 7(a) is

generally lower than under § 7(b), resulting in a higher Appendix C § 2(b)(i) Annuity Benefit,

therefore affecting RAA eligibility and level of any benefits.  Plaintiffs allege that Defendants

should have applied § 7(a) to Participants like McCutcheon.  Defendants assert that they

properly applied § 7(b) to such Participants.  Defendants are correct.

Based on a plain reading of § 7, Defendants are correct that the PIA for Participants like

McCutcheon is governed by § 7(b) rather than § 7(a).  The language is not ambiguous because

"it is capable of [only] . . . one meaning when viewed objectively by a reasonably intelligent

person who has examined the context of the entire integrated agreement."  *Strom*, 497 F.3d at

244 n.6.

Here, the Plan makes clear that the PIA is an estimate of the amount a Participant will

receive from Social Security, to be used as an offset to the target level of retirement income a

Participant will receive.  To calculate the PIA requires an assumption about the terminating

employee's earnings after separating from Colgate.  The Plan offers only two choices: an

assumption of no future earnings for Participants who retire directly from Colgate, or an

assumption of future earnings that will continue until the year prior to age sixty-two for others.

Participants like McCutcheon do not fit neatly in the definition of either group.  When

McCutcheon terminated employment at age thirty-seven, she did not "retire" -- in the usual

sense of the word -- directly from the employment at Colgate (so not within the terms of § 7(a)),

but she *was* in active employment at Colgate immediately prior to her Benefit Commencement

Date (and therefore not within the express terms of § 7(b)), since the Plan provided for an immediate lump sum payment upon termination.  Nevertheless, § 7 offers only two choices, so that McCutcheon and others like her who left the company's employ before age sixty-two must fall under either § 7(a) or § 7(b).  In the context of the entire integrated agreement, the only reasonable interpretation of § 7 is that she is in the second group, which carries the assumption that she continued to work after leaving Colgate until she reached age sixty-two.  The other assumption, that she had no further earnings after her Colgate employment, is not a reasonable assumption or interpretation given the two choices in § 7, when viewed by a reasonably intelligent person in the context of the entire Plan.  This interpretation -- which is aimed at applying a reasonable estimate of future social security earnings -- is reinforced by the provision in § 7 following the disputed language that permits a Participant to submit her actual Social Security earnings history, which will instead be the basis for calculating the Participant's benefits.

To support the argument that § 7(b) does not apply, Plaintiffs dispute Defendants' argument about the Committee's prior practice under the Grandfathered Plan before the cash balance conversion in 1989 and before the Appendices at issue existed.  This argument relies on evidence extrinsic to the Plan and Appendices, and therefore is not properly considered in light of the finding that Appendix § 7 is unambiguous in its inclusion of McCutcheon in § 7(b).  Similarly, the parties' dispute about which version of an administrative manual might shed light on the issue relies on extrinsic evidence that is not properly considered.  Accordingly, summary judgment is granted to Defendants with respect to Error 2.

### c.  Error 3

In Error 3, Plaintiffs argue that Defendants improperly used a pre-retirement mortality

discount ("PRMD") to determine a Class Member's RAA Annuity in the calculation of the age

sixty-five actuarial equivalence for the period prior to age sixty-five (normal retirement age).

Plaintiffs do not dispute that the PRMD is called for by the Plan.  Instead they argue that

Defendants' use of PRMD violates the law -- ERISA § 203(a)(2) and IRC § 417(e)'s actuarial

equivalence rules.  As a question of law, the Court reviews Error 3 de novo.  *See Wilkins*, 445

F.3d at 581 ("The interpretation of ERISA, a federal statute, is a question of law subject to *de*

*novo* review."); *accord Munnelly v. Fordham Univ. Faculty*, 316 F. Supp. 3d 714, 727 (S.D.N.Y.

2018).  For the following reasons, summary judgment is denied to Defendants on Error 3.

A mortality discount factors into the present value of a benefit -- here an age sixty-five

single life annuity -- the possibility that the participant might die before the projected end date of

the benefit, here age sixty-five.  For example, a plan could determine the present value of a

benefit by projecting the cash balance account forward to age sixty-five and then discounting the

account back to the participant's current age, and then applying a further mortality discount.

The amount of the discount is taken from the plan's applicable mortality table.[8]

Plaintiffs argue that a mortality discount should not be used to determine the present

value of a normal retirement annuity when, as prescribed by the Plan, the ultimate benefit paid

does not significantly decrease if the participant dies before normal retirement age (i.e., the

benefit payable to the beneficiary upon death is not significantly less than what would have been

paid to the participant upon survival), as is the case here.  Plaintiffs cite multiple out-of-Circuit

cases, which have found an IRC § 417(e) violation in similar circumstances.  *See West v. AK*

*Steel Corp*., 484 F.3d 395, 411 (6th Cir. 2007) (agreeing with the district court that applying a

---

[8] This example is merely illustrative and focuses on an individual who, like McCutcheon, received benefits prior to 2006 and the enactment of the Pension Protection Act.

mortality discount to reduce the present value of a pre-retirement lump-sum distribution where the death benefit is equal to the participant's pension benefit would create an impermissible forfeiture under ERISA); *Berger v. Xerox Corp. Ret. Income Guarantee Plan*, 338 F.3d 755, 764 (7th Cir. 2003) (affirming and observing that the use of a pre-retirement mortality discount was "unfathomable" because the participant's death would not reduce his benefits); *Ruppert v. Alliant Energy Cash Balance Pension Plan*, No. 08 Civ. 127, 2010 WL 5464196, at *2, 16-18 (W.D. Wis. Dec. 29, 2010); *Crosby v. Bowater Inc. Ret. Plan For Salaried Emps. of Great N. Paper, Inc.*, 212 F.R.D. 350, 360-62 (W.D. Mich. 2002), *vacated on other grounds*, 382 F.3d 587 (6th Cir. 2004). The rationale is that "applying a pre-retirement mortality discount to a retirement benefit that does not decrease if the participant dies would result in a lump sum that was less than the actuarial equivalent of the annuity it [was] supposed to replace" and therefore would "result in a forfeiture prohibited by ERISA." *West v. AK Steel Corp. Ret. Accumulation Pension Plan*, No. 02 Civ. 0001, 2005 WL 3465637, at *5 (S.D. Ohio Dec. 19, 2005) (internal quotation marks omitted), *aff'd sub nom.*, *West*, 484 F.3d 395.

This reasoning is persuasive. As applied to this case, no PRMD should be used to determine a Class Member's RAA Annuity in the calculation of the age sixty-five actuarial equivalence for the period prior to age sixty-five because the death benefit is defined as "the Actuarial Equivalent of the Accrued Benefit" in § 5.1(a) of the Plan. Under 26 C.F.R. § 1.417(e)-1, "[t]he present value of any optional form of benefit cannot be less than the present value of the normal retirement benefit determined in accordance with the preceding sentence." 26 C.F.R. § 1.417(e)-1. Here, a PRMD is used to determine the present value of the Age 65 AE of the LS paid -- a benefit that must be paid in all events and does not decrease if the Participant dies prior to reaching age sixty-five. This results in a present value that is less than the

corresponding normal retirement benefit and therefore violates 26 C.F.R. § 1.417(e)-1.  *See West*, 484 F.3d at 411; *Berger*, 338 F.3d at 764.  Therefore, a PRMD should not be applied.

Defendants argue that a proposed 2016 IRS regulation explicitly rejects Plaintiffs' argument regarding the unlawful use of a PRMD in this context, with citation to the same cases upon which Plaintiffs rely.  *See* Update to Minimum Present Value Requirements for Defined Benefit Plan Distributions, 81 Fed. Reg. 85,190 (proposed Nov. 25, 2016) (to be codified at 26 C.F.R. pt. 1).  Defendants also argue that the IRS approved the Plan's use of PRMD in 2003, when it qualified the Plan, that this interpretation should be entitled to deference, and that the Second Circuit has separately held that IRS interpretations are entitled to deference.

While Plaintiffs are correct that proposed regulations may provide guidance, they are not binding.[9]  *See LeCroy Research Sys. Corp. v. Comm'r*, 751 F.2d 123, 127 (2d Cir. 1984) ("Proposed regulations are suggestions made for comment; they modify nothing."); *accord Sweet v. Sheahan*, 235 F.3d 80, 87 (2d Cir. 2000) ("Implicit in our argument is the established point of law that proposed regulations . . . have no legal effect.").  The Second Circuit case on which Defendants rely for the proposition that IRS interpretations are entitled to deference involves an IRS regulation that was adopted, rather than merely proposed.  *See Hurwitz v. Sher*, 982 F.2d 778, 782 (2d Cir. 1992) (addressing 26 C.F.R. § 1.401(a)-20, effective March 24, 2006).

Further, the proposed regulations cited by Defendants appear to support Plaintiffs'

---

[9] The proposed regulations were published on November 25, 2016, and have not become final since.  *See* Update to Minimum Present Value Requirements for Defined Benefit Plan Distributions, 81 Fed. Reg. 85,190 (proposed Nov. 25, 2016) (to be codified at 26 C.F.R. pt. 1). Written and electronic comments were submitted by February 23, 2017, and discussed at a public hearing on March 7, 2017.  *Id.*

position.  They would update existing regulations for minimum present value requirements for

defined benefit plan distributions, including the treatment of preretirement mortality discounts in

determining the minimum present value of accrued benefits.  *See* Update to Minimum Present

Value Requirements for Defined Benefit Plan Distributions, 81 Fed. Reg. at 85,192.  As relevant

here, according to the proposed regulations, the probability of death (under the applicable

mortality table) during an assumed deferral period, if any, would not be taken into account for

purposes of determining the present value under IRC § 417(e)(3) of an accrued benefit derived

from contributions made by an employee.  *Id*.  This is because, according to the proposed

regulations, an employee's rights in the accrued benefits from the employee's own contributions

are non-forfeitable under IRC § 411(a)(3)(A), and the exception for death under IRC §

411(a)(3)(A) to the non-forfeitability of accrued benefits does not apply to the accrued benefit

derived from employee contributions.  *Id*.  In other words, the proposed regulation appears to

forbid the application of a PRMD to determine the present value of an accrued benefit derived

from contributions made by the employee, as is the case here.

For these reasons, summary judgment is denied to Defendants on Error 3.

### d.  Error 4

In Error 4, the Complaint alleges that, while the *Colgate I* settlement agreement required

future RAA Annuities to be offset by *Colgate I* settlement proceeds, the Plan itself was not

amended prior to applying the offsets to the payments; and if the Plan were retroactively

amended now, that would result in an impermissible cutback in benefits under ERISA § 204(g)

and IRC § 411(d)(6).  *See* ERISA § 204(g), 29 U.S.C. § 1054(g); I.R.C. § 411(d)(6).  For the

following reasons, summary judgment is granted to Defendants on Error 4 as to the Class, and

denied to Defendants as to McCutcheon alone.

"ERISA was enacted 'to ensure that employees will not be left empty-handed once employers have guaranteed them certain benefits.'"  *Morrone v. Pension Fund of Local No. One, I.A.T.S.E.*, 867 F.3d 326, 332 (2d Cir. 2017) (quoting *Lockheed Corp. v. Spink*, 517 U.S. 882, 887 (1996)).  Part of this purpose is ensuring that once "'a worker has been promised a defined pension benefit upon retirement . . . and if [she] has fulfilled whatever conditions are required to obtain a vested benefit . . . [she] actually will receive it.'"  *Id.* (quoting *Nachman Corp. v. Pension Benefit Guar. Corp.*, 446 U.S. 359, 375 (1980)).  "The . . . 'anti-cutback rule' is 'crucial' to this purpose."  *Id.* (quoting *Cent. Laborers' Pension Fund v. Heinz*, 541 U.S. 739, 744 (2004)).  The anti-cutback rule is found in ERISA § 204(g)(1), which directs that "[t]he accrued benefit of a participant under a plan may not be decreased by an amendment of the plan."  ERISA § 204(g)(1), 29 U.S.C. § 1054(g)(1); *accord Morrone*, 867 F.3d at 332.

There is no dispute that under the terms of the *Colgate I* settlement agreement, the parties agreed that the Plan would apply the settlement funds as an offset against any RAA Annuities later determined to be payable.  The Court approved the settlement and ordered the Plan, among others, "to undertake the necessary steps to effectuate forthwith the Settlement according to its terms."  The Committee complied with the order on December 5, 2014, and "acting in its settlor capacity," resolved that "the administration and payment of benefits" under the Plan be "in accordance with the terms of the Settlement Agreement."

Plaintiffs in substance argue that the offset for settlement funds was contrary to the terms of the Plan because Defendants failed to amend the Plan prior to applying the offset to the RAA Annuities.  This argument is unpersuasive.  The Committee's decision to comply with the Court's order despite the absence of amendment is subject to the arbitrary and capricious standard with respect to the Class.  Plaintiffs have not shown that this decision was "without

31

reason, unsupported by substantial evidence or erroneous as a matter of law." *Roganti*, 786 F.3d at 211. To the contrary, if the Committee had failed to abide by the terms of the settlement agreement, and had failed to apply the setoff, that likely would have been a breach of fiduciary duty. *See In re DeRogatis*, 904 F.3d 174, 190 (2d Cir. 2018). And to reverse the setoff now, only with respect to the subset of *Colgate I* class members who are Class Members in this action, would be unfair and discriminatory to the remaining *Colgate I* class members.

Accordingly, summary judgment is granted to Defendants on Error 4 as to the Class. Summary judgment is denied to Defendants on Error 4 as to McCutcheon alone, because the legal arguments are not sufficiently developed to determine which party has the better argument applying the de novo standard of review applicable to McCutcheon's claim.

## IV.   CONCLUSION

For the foregoing reasons, Defendants' motion for summary judgement is GRANTED in part, and DENIED in part as follows:

- Count I – granted
- Count II:
  - Error 1 – denied
  - Error 2 – granted
  - Error 3 – denied
  - Error 4 – granted as to the Class, denied as to McCutcheon

Defendants' request for oral argument is DENIED as moot, as is Plaintiffs' request for a pre-motion conference on the application to file a surreply.

The Clerk of Court is respectfully directed to close the motion at Docket No. 235.

Dated: July 10, 2020
      New York, New York

**Lorna G. Schofield**
**United States District Judge**