UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

-------------------------------------------------------------- X
                                                    :
REBECCA MCCUTCHEON, et al.,                         :
                                       Plaintiffs,  :
                                                    :        16 Civ. 4170 (LGS)
          -against-                                 :
                                                    :        **OPINION, ORDER**
COLGATE-PALMOLIVE CO., et al.,                      :        **AND FINAL**
                                                    :        **JUDGMENT**
                                       Defendants.  :
-------------------------------------------------------------- X

LORNA G. SCHOFIELD, District Judge:

Plaintiff and class representative Rebecca McCutcheon[1] brings this action, on behalf of

herself and others similarly situated, under the Employee Retirement Income Security Act of

1974, 29 U.S.C. § 1001 et seq. ("ERISA"), against Defendants Colgate-Palmolive Co.

("Colgate"), Colgate-Palmolive Co. Employees' Retirement Income Plan (the "Plan"), Laura

Flavin, Daniel Marsili and the Employee Relations Committee of Colgate-Palmolive Co. (the

"Committee").

In its Opinion and Order of July 10, 2020 (Dkt. No. 265), the Court granted Defendants

summary judgment on Count I, Count II, Error 2 and Count II, Error 4 as to the Class but not as

to Plaintiff McCutcheon.  *McCutcheon v. Colgate-Palmolive Co.*, No. 16 Civ. 4170, 2020 WL

3893303, at *16 (S.D.N.Y. July 10, 2020).  At the same time, the Court denied Defendants

summary judgment on Count II, Error 1 and Error 3.  *Id.*; *see also* 7/29/20 Order (Dkt. No. 274)

(supplementing *McCutcheon*, 2020 WL 3893303 with inadvertently omitted additional reasons

for denying Defendants summary judgment on Error 1).  Plaintiffs now move for summary

---

[1] The Plaintiffs are McCutcheon and her former husband, Paul Caufield.  Only McCutcheon is a
class representative.  She brings claims under Counts I and II.  Caufield seeks relief on Count II,
but not Count I.

judgment on Count II, Errors 1 and 3 and for entry of final judgment under Rule 54(b).  This Opinion largely mirrors the language of the decision on Defendants' motion for summary judgment on the same issues, with the addition of citations and with minor modifications or clarifications, many of which were proposed by Plaintiffs in their proposed order, which the Court requested.  For the following reasons, Plaintiffs' motion is granted.

## I.   BACKGROUND

The facts below are drawn from the record and are undisputed or there is no genuine issue as to any of the following material facts.

### A.   History of the Plan

#### a.   Colgate-Palmolive Company and the Committee

Defendant Colgate is a global consumer products company and is the sponsor of the Plan. Ans. (Dkt. No. 49) ("Ans.") ¶ 36; Defs. Rule 56.1 Stmt of Facts (Dkt. No. 237) ("Defs. SOF") ¶¶ 8-9.  At all relevant times, Defendant Plan was an "employee pension benefit plan" and a defined benefit plan within the meaning of ERISA; Defendant Committee was the "plan administrator," and, along with non-party the Pension Fund Committee, was a "named fiduciar[y]" of the Plan. Ans. ¶¶ 35, 40, 111; Defs. SOF ¶¶ 10-11.  Defendants Daniel Marsili (Senior Vice President of Global Human Resources) and Laura Flavin (Vice President for Global Employee Compensation and Benefits) were members of the Committee.  Ans. ¶¶ 46-47.

#### b.   Conversion to Cash Balance Plan as of 1989

The Plan originally operated as a traditional defined benefit plan, which guaranteed that each member (or "Participant") receive an "accrued benefit" expressed as an annuity upon reaching "normal retirement age," here, age sixty-five.  Ans. ¶¶ 35, 55; Defs. SOF ¶¶ 9, 11. Prior to July 1, 1989, the Plan determined the level of benefits using a final average pay formula

(the "Grandfathered Formula"), based on a Participant's final average earnings and years of credited service.  Participants received their Plan benefits only in the form of an annuity.  Defs. SOF ¶ 12-13.

The Plan was amended in 1994, effective as of July 1, 1989, and reflected the terms of the Plan in effect and applicable to all Class Members paid between July 1, 1989, and the effective date of the 2003 Plan, including Plaintiff.  30(b)(6) Deposition Transcript ("30(b)(6) Tr."), Ex. 1C (Dkt. No. 242-1) 78:23-81:15, 85:23-87:20, 232:16-20; Ans. ¶ 59; Defs. SOF ¶ 34; Pls. SJ Opp (Dkt. No. 241) ("Pls. Opp.") at 3.  Effective July 1, 1989, the Plan was converted to a cash balance plan.  Ans. ¶ 59; Defs. SOF ¶ 11.  As a cash balance plan, each Participant had a "cash balance" account called the Personal Retirement Account balance, which reflected a set percentage of yearly pay plus interest (the "PRA Formula").  Defs. SOF ¶ 16.  Unlike the prior version of the Plan using the Grandfathered Formula, the cash balance plan allowed Participants to elect to receive their benefits either as a lump sum or an annuity beginning on the "benefit commencement date" (i.e., the first date of the first period when a Participant is paid).  *Id.*

Because the Plan is considered a defined benefit plan under applicable law, Internal Revenue Code ("IRC") § 417(e) and ERISA § 205(g) require any lump sum payment to be no less than the actuarial equivalent of the Participant's accrued benefit expressed as a single life annuity payable at normal retirement age.  I.R.C. § 417(e); ERISA § 205(g), 29 U.S.C. § 1055(g); *accord Esden v. Bank of Bos.*, 229 F.3d 154, 164 (2d Cir. 2000); Ans. ¶ 57; Defs. SJ Br. (Dkt. No. 236) at 25; Defs. SOF ¶ 18; 9/4/19 Collins Decl. (Dkt. No. 238) ¶ 42); 6/17/19 Expert Report of Jeff Leonard (Dkt. No. 259) (Leonard Rep.) ¶¶ 42, 46-47.  If a benefit is paid even partially as a lump sum, IRC § 417(e) applies, with the result that the total value of the benefit paid cannot be less than the value of the accrued benefit determined using IRC § 417(e).  *See*

Rev. Rul. 89-60; Treas. Reg. § 1.417(e)-1(d); Defs. 6/4/15 Ltr. (Dkt. No. 21-6) at 13-14; Ans. ¶ 57.  To determine actuarial equivalence, a plan administrator projects the cash balance forward to normal retirement age, converts that cash balance to an age sixty-five annuity and then converts that age sixty-five annuity to a lump sum and discounts back the lump sum to present value.  Defs. SOF ¶ 18; Leonard Rep. ¶ 46.  A plan can select a different rate to project the cash balance forward into an age sixty-five single-life annuity, but the discount rate to determine the present value of the accrued benefit (annuity) is prescribed by IRC § 417(e).  *See* I.R.C. § 417(e); *Esden*, 229 F.3d at 164; *accord* Defs. SOF ¶ 19; Leonard Rep. ¶ 47.

For Class Members who, like McCutcheon, received their benefit between 1989 and 2002, the Plan document used a projection rate of the 20-year Treasury bill interest rate plus 1% ("20+1% rate").  1994 Plan (Dkt. No. 21-9) § 1.3; 2003 Plan § 1.3 (as in effect through February 28, 2002) (Dkt. No. 21-48); 5/16/19 Expert Report of Lawrence Deutsch (Dkt. No. 261) ("Deutsch Rep.") at 4.  This projection rate, used to convert the cash balance into an age sixty-five annuity (for Participants younger than sixty-five), was dictated by § 1.3 of the Plan, which defined "Actuarial Equivalent" and in its first paragraph states that "for purposes of converting a Member's Account into a single life annuity payable for the life of the Member starting at Normal Retirement Date" (i.e. age 65) the 20+1% rate is applied.  1994 Plan § 1.3; 2003 Plan § 1.3 (as in effect through February 28, 2002).  The discount rate to determine the present value of the accrued benefit (annuity) as prescribed by IRC § 417(e) at the time of the adoption of the Plan in 1989 until February 28, 2002 (i.e. the day before the effective date of the 2003 Plan), was a blend of interest rates equal to the Pension Benefit Guaranty Corporation ("PBGC") rate.  I.R.C. § 417(e)(3)(A)(ii)(II) (current version at I.R.C. § 417(e)(3)(C)); I.R.S. Notice 87-20, 1987-1 C.B. 456 (Feb. 9, 1987); Deutsch Rep. ¶ 24.  The 20+1% rate from 1989 through February 28,

2002 was consistently and substantially higher than the PBGC rate.  Morgan Tr., Ex. 1A (Dkt. No. 242-1) 550:19-23; Deutsch Rep. ¶¶ 37(2)-(3), 45.

### c.  Plan Appendices -- Preservation of Benefits Under Grandfathered Formula

When the cash balance plan and PRA Formula were adopted as of 1989, employees who were then still employed by Colgate were given the option to continue benefits under the Grandfathered Formula as set forth in Appendices A through D of the Plan.  1994 Plan, Appendix C § 2; Defs. SOF ¶ 20; Defs. SJ Br. at 1; Pls. Opp. at 7.  The Appendices offered protection to Participants, like McCutcheon, who worked at Colgate prior to 1989, remained employed after the conversion to the cash balance plan but had accrued benefits under the previous Grandfathered Formula.  *Id*.  Under Appendix C, these Participants could elect to make contributions to continue to accrue benefits under the Grandfathered Formula.  1994 Plan, Appendix C § 2; Defs. SOF ¶ 24; Defs. SJ Br. at 18; Leonard Rep. ¶ 14 ("employee contributions allowed [those] individuals to continue to accrue benefits under the Grandfathered Formula").  If a Participant elected to make these contributions, and did so until her separation from service, she would be entitled to a benefit no less than her accrued benefit under the PRA Formula plus her employee contributions to maintain the Grandfathered Formula, in the form of either a lump sum or an annuity.  1994 Plan, Appendix C § 2; Defs. 3/24/17 Ltr. (Dkt. No. 47) at 2-3; Defs. 6/4/15 Ltr. at 7, 13; Ans. ¶¶ 211, 214; Defs. SJ Br. at 18; Defs. SOF ¶¶ 26, 28-29.

### d.  The Residual Annuity Amendment and 2005 Implementation

In 2004, it came to Colgate's attention that the lump sum payments that the Plan had been paying to Participants -- who continued making contributions to maintain Grandfathered Formula benefits -- were less than the Participants would have otherwise received had they elected to receive an annuity.  Defs. 6/4/15 Ltr. at 11; Ans. ¶¶ 68-69, 107; Defs. SJ Br. at 6-7, 20-

22, 27; Leonard Rep. ¶¶ 102-03, 105, 108, 164-65; Defs. SOF ¶¶ 48-51, 54, 57, 59; 5/11/14

Mellon Presentation (Dkt. No. 238-1) at 12-16, 21; *see also* April 2002 Risk Assessment (Dkt.

No. 242- 2) at COL_STALEY000024984.  On March 30, 2005, the Committee adopted the RAA

to address the potential unlawful forfeiture of benefits.  Defs. 6/4/15 Ltr. at 11; Defs. 5/22/17 Ltr.

(Dkt. 57) at 3; Ans. ¶¶ 69, 74, 107, 180.

The RAA amended the Plan and granted a residual annuity (the "RAA Annuity") to any

Participant who elected a lump sum payment upon separation, who met a threshold eligibility

requirement (discussed further below) and whose age sixty-five single life annuity benefit

otherwise payable to the Member under Appendices B, C or D, as applicable, was greater than

the age sixty-five single life annuity actuarial equivalent of a Participant's lump sum payment

(the "Age 65 AE of LS paid").  Residual Annuity Amendment (Dkt. No. 21-3) ("RAA") ¶ 5.

The amount of the RAA Annuity was the delta between the two amounts.  After the Committee

adopted the RAA in 2005, it was implemented only for prospective retirees, i.e., those

Participants who retired after March 2005, even though the RAA was effective as of July 1,

1989.  Defs. 8/29/16 MTD (Dkt. No. 26) at 2; Defs. SJ Br. at 2-3, 18; Ans. ¶¶ 9, 18; Defs. SOF

¶¶ 62, 75, 78; Leonard Rep. at 62 n.18.  Retroactive implementation of the RAA did not occur at

that time for Participants who had retired between July 1989 and February 2005, such as

McCutcheon.  *Id*.

### e.   *Colgate I* Settlement and Retroactive Implementation of the RAA

In 2007, a class action was commenced on behalf of several thousand Participants against

Colgate, alleging that their pension benefits had been miscalculated.  *See In re Colgate-*

*Palmolive Co. ERISA Litig.* *("Colgate I")*, 36 F. Supp. 3d 344 (S.D.N.Y. 2014).  In May 2010,

the parties in *Colgate I* reached an agreement in principle to settle that case.  Ans. ¶ 128.  Up to

6

that point, counsel for the plaintiffs in *Colgate I* had not been aware of the RAA. *See* Ans. ¶ 131; 2/24/17 Order (Dkt. No. 35) at 4. Once plaintiffs' counsel received a copy of the RAA in July 2011, all RAA-related claims were carved out of the settlement agreement. Ans. ¶ 132; 2/24/17 Order at 4. The Court approved the final settlement agreement on July 8, 2014. Ans. ¶¶ 144-148.

After the *Colgate I* settlement, Defendants retroactively applied the RAA, granting millions of dollars of additional annuity benefits to a few hundred Participants who had taken a lump sum payment between 1989 and 2005, *see* Defs. SOF ¶ 86, the vast majority of whom had elected to make contributions to maintain the Grandfathered Formula. Deutsch Rep. at 64 ¶¶ 202, 205. Defendants contend that all Participants entitled to an RAA Annuity received one at that time. Ans. ¶ 3; Defs. SJ Br. at 7. Plaintiffs dispute this.

**B.    McCutcheon's Administrative Claim and Appeal**

McCutcheon was employed by Colgate from 1979 to 1994, and participated in the Plan during that time. Ans. ¶ 32; Defs. SOF ¶ 5. After the Plan converted in 1989, she made contributions to continue the Grandfathered Formula until she resigned from the company at the age of thirty-seven in 1994. Ans. ¶ 86; Defs. SOF ¶ 5; Defs. 11/4/14 Ltr. (Dkt. No. 21-5). She elected to receive her pension benefit as a lump sum distribution of $22,425.64. 1994 Worksheets (Dkt. No. 21-32) at 1-2. She did not receive any benefit under the RAA when it was enacted in 2005. Defs. SJ Br. at 2-4; 2/24/17 Order at 4. On July 30, 2014, she submitted a claim letter to the Committee, stating that she was entitled to an RAA Annuity, in addition to the lump sum payment she had received in 1994. McCutcheon 7/30/14 Ltr. (Dkt. No. 21-8). She requested that Defendants begin paying her an RAA Annuity, and provide an explanation of how it was calculated. *Id.*

7

Defendant Flavin responded on behalf of the Committee and denied McCutcheon's claim, by letter dated November 4, 2014.  Defs. 11/4/14 Ltr.  Because her Grandfathered Benefit (calculated as $699.58) was less than her Age 65 AE of LS paid (calculated as $752.84), the Committee concluded that McCutcheon was not entitled an RAA Annuity.  *Id*. at 3.  On January 6, 2015, McCutcheon sent a letter to the Committee, requesting, among other things, certain documents, information and responses to questions described in the letter.  McCutcheon 1/6/15 Ltr. (Dkt. No. 21-28).  On March 5, 2015, Defendant Flavin responded to McCutcheon on behalf of the Committee, attaching some, but not all, of the documents McCutcheon had requested.  Defs. 3/5/15 Ltr. (Dkt. No. 21-11).

McCutcheon formally appealed the Committee's benefit denial decision in a letter dated April 6, 2015, identifying four errors ("Errors") that the Committee allegedly committed in the course of calculating her RAA Annuity.  McCutcheon 4/6/15 Ltr. (Dkt. No. 21-4).  The four Errors are the basis for the denial of benefits claim in Count II.  Two of these Errors -- Errors 1 and 3 -- and are discussed in detail below.  On June 4, 2015, in a sixteen-page letter signed by Defendant Marsili, the Committee denied McCutcheon's appeal.  Defs. 6/4/15 Ltr.

## C.    Relevant Procedural History

McCutcheon commenced this action on June 3, 2016, asserting five causes of action. The Magistrate Judge overseeing pre-trial proceedings bifurcated the case and ordered only Counts I and II to proceed.  Count I is not a class claim.  Count I alleges that Defendants violated 29 C.F.R. § 2560.503-1 by failing to produce all relevant documents and information during McCutcheon's claim and appeal.  Count II alleges that Plaintiffs were wrongfully denied residual annuity benefits under the Residual Annuity Amendment (the "RAA") and incorporated Plan provisions.

On July 27, 2017, the Court granted Plaintiffs' motion for class certification as to Count

II and appointed McCutcheon as class representative of a class consisting of:

> any person who, under any of Appendices B, C or D of the Plan, is entitled to a greater benefit than his or her Accrued Benefit as defined in Plan § 1.2, provided such person received a lump sum payment from the Plan, and the beneficiaries and estates of any such person.

*Caufield v. Colgate-Palmolive Co.*, No. 16 Civ. 4170, 2017 WL 3206339, at *8 (S.D.N.Y. July

27, 2017).  Given this class definition, each Class Member (1) was a Colgate employee in July

1989, (2) received a lump sum payment from the Plan and (3) is entitled to a greater benefit

under any of Appendices B, C or D than his or her Accrued Benefit as defined in Plan § 1.2,

which defines Accrued Benefit in part as the "Actuarial Equivalent of the Member's Account."

Plaintiffs estimate that the Class consists of approximately 1,200 individuals, *id*. at *4, with

claims totaling approximately $300,000,000.  Deutsch Rep. at 69 ¶ 230.

As noted above, the Court granted in part and denied in part Defendants' motion for

summary judgment.  Plaintiffs then filed a letter motion seeking leave to file a motion that would

(1) allow Plaintiffs to voluntarily dismiss with prejudice Counts III-V of the Complaint, (2) grant

summary judgment as to the remaining surviving claims and (3) ask the Court to enter final

judgment under Federal Rule of Civil Procedure 54(b).  (Dkt. No. 267).  The Court granted

Plaintiffs' requests, dismissed Counts III-V with prejudice, and set a briefing schedule for this

motion.  (Dkt. No. 275).  Plaintiffs now seek summary judgment on Count II, Errors 1 and 3.

## II.   LEGAL STANDARD

Summary judgment is appropriate if the record establishes that there is no "genuine

dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed.

R. Civ. P. 56(a).  "A genuine issue of material fact exists if 'the evidence is such that a

reasonable jury could return a verdict for the nonmoving party.'" *Nick's Garage, Inc. v. Progressive Cas. Ins. Co.*, 875 F.3d 107, 113 (2d Cir. 2017) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)).  The moving party "bears the burden of 'demonstrat[ing] the absence of a genuine issue of material fact.'"  *Id.* at 114 (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986)) (alteration in original).  The evidence is construed in the light most favorable to, and all reasonable inferences are drawn in favor of, the nonmoving party.  *Id.* at 113.  "Summary judgment should be denied where there are genuine issues of material fact 'that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party.'"  *Davis-Garett v. Urban Outfitters, Inc.*, 921 F.3d 30, 45 (2d Cir. 2019) (quoting *Anderson*, 477 U.S. at 250).

## III.   DISCUSSION

Plaintiffs' denial of benefits claim in Count II is based on four alleged Errors Defendants made when interpreting and calculating benefits under the RAA.  Plaintiffs seek summary judgment on Errors 1 and 3.  As explained below, summary judgment is granted to Plaintiffs on these two aspects of Count II.

### A.   Error 1

As Error 1, Plaintiffs assert that Defendants miscalculated the RAA benefit, causing an impermissible forfeiture of benefits by Class Members.  For the following reasons, summary judgment is granted to Plaintiffs on Error 1, because, regardless of the standard of review, based on the unambiguous terms of the Plan, Defendants' interpretation is erroneous as a matter of law.

10

### 1. Legal Principles for Construing a Plan

When a plan is construed in ERISA cases involving claims under § 1132(a)(1)(B), courts interpret the plan according to "federal common law," which is "largely informed by state law principles." *Lifson v. INA Life Ins. Co. of New York*, 333 F.3d 349, 352-53 (2d Cir. 2003); *accord Stets v. Securian Life Ins. Co.*, No. 17 Civ. 09366, 2020 WL 1467395, at *5 (S.D.N.Y. Mar. 25, 2020). Courts first look to determine if the Plan's terms are ambiguous. *See O'Neil*, 37 F.3d at 58-59; *accord Verdier v. Thalle Constr. Co., Inc.*, No. 14 Civ. 4436, 2017 WL 78512, at *4 (S.D.N.Y. Jan. 5, 2017), *aff'd*, 771 F. App'x 20 (2d Cir. 2019). "Whether ERISA plan language 'is ambiguous is a question of law that is resolved by reference to the contract alone.'" *Strom v. Siegel Fenchel & Peddy P.C. Profit Sharing Plan*, 497 F.3d 234, 244 n.6 (2d Cir. 2007) (quoting *O'Neil*, 37 F.3d at 59); *accord Verdier*, 2017 WL 78512, at *4. "Language is ambiguous when it is capable of more than one meaning when viewed objectively by a reasonably intelligent person who has examined the context of the entire integrated agreement." *Strom*, 497 F.3d at 244 n.6 (internal quotation marks omitted); *accord Verdier*, 2017 WL 78512, at *4.

If the terms of the Plan are unambiguous, they are enforced according to their terms. "Where . . . plan language categorically states that certain benefits will be provided, *de novo* review is appropriate because unambiguous language leaves no room for the exercise of discretion." *O'Neil*, 37 F.3d at 59; *accord Strom*, 497 F.3d at 244 n.6 ("[U]nambiguous language in an ERISA plan must be interpreted and enforced in accordance with its plain meaning."). The court is to "review the Plan as a whole, giving terms their plain meanings." *Fay v. Oxford Health Plan*, 287 F.3d 96, 104 (2d Cir. 2002); *accord Jarosz v. Am. Axle & Mfg., Inc.*, 372 F. Supp. 3d 163, 178 (W.D.N.Y. 2019); *see Brass v. Am. Film Techs., Inc.*, 987 F.2d

142, 148 (2d Cir. 1993) ("Where the [contract] language is plain and unambiguous, a court may construe the contract and grant summary judgment.").

If the terms of the Plan are ambiguous, the denial of benefits is considered under the arbitrary and capricious standard where the party making the interpretation has discretion to interpret the terms. *O'Neil*, 37 F.3d at 59; *accord Jarosz*, 372 F. Supp. 3d at 175. A denial of benefits is "arbitrary and capricious only if the decision is without reason, unsupported by substantial evidence or erroneous as a matter of law." *Fay*, 287 F.3d at 104 (internal quotation marks omitted); *accord Jarosz*, 372 F. Supp. 3d at 175. "'[W]here the trustees of a plan . . . interpret the plan in a manner inconsistent with its plain words, or by their interpretation render some provisions of the plan superfluous, their actions may well be found to be arbitrary and capricious.'" *DeCesare v. Aetna Life Ins. Co.*, 95 F. Supp. 3d 458, 481 (S.D.N.Y. 2015) (quoting *O'Shea v. First Manhattan Co. Thrift Plan & Tr.*, 55 F.3d 109, 112 (2d Cir. 1995)). But where both the interpretation proffered by the administrator and the interpretation proffered by the claimant are reasonable, the administrator's interpretation will not be disturbed. *Novella v. Westchester Cty.*, 661 F.3d 128, 140 (2d Cir. 2011); *accord Jarosz*, 372 F. Supp. 3d at 175.

"It is axiomatic that where the language of a contract [at issue in a § 1132(a)(1)(B) claim] is unambiguous, the parties' intent is determined within the four corners of the contract, without reference to external evidence." *Feifer v. Prudential Ins. Co. of Am.*, 306 F.3d 1202, 1210 (2d Cir. 2002); *accord Halpern v. Blue Cross/Blue Shield of W. New York*, No. 12 Civ. 407, 2014 WL 4385759, at *10 (W.D.N.Y. Sept. 4, 2014); *Brooks v. Macy's, Inc.*, No. 10 Civ. 5304, 2011 WL 1793345, at *2 (S.D.N.Y. May 6, 2011). By contrast, when a plan's terms are ambiguous, "an employer is entitled to summary judgment if it presents extrinsic evidence sufficient to remove the ambiguity and that evidence is not contradicted by opposing evidence." *Gilbert v.*

*Related Mgmt. Co., L.P.*, No. 95 Civ. 9610, 1998 WL 99801, at \*4 (S.D.N.Y. Mar. 4, 1998),

*aff'd sub nom.*, 162 F.3d 1147 (2d Cir. 1998) (collecting cases).

### 2. Construing the RAA

In broad terms, Error 1 involves how to determine who is entitled to an RAA Annuity

benefit, and the amount of any such benefit.  Plaintiffs seek summary judgment, arguing that

eligibility is determined by comparing the Appendix benefit (which is the greater of the

Grandfathered benefit or the sum of the Accrued Benefit as defined in Plan § 1.2 and any

Employee Contributions) to the Accrued Benefit as defined in Plan § 1.2 (with the outcome that

if either the Grandfathered benefit exceeds the Accrued Benefit as defined in Plan § 1.2 or the

participant elected to make Employee Contributions, then the participant will be entitled to a

Residual Annuity).  Plaintiffs further argue that the amount of the Residual Annuity is

determined by comparing the Age 65 AE of LS paid (defined above as the "Age 65 actuarial

equivalent of the lump sum paid") with the <u>greater of</u> the Grandfathered Benefit <u>or</u> the

Member's Accrued Benefit as defined in Plan § 1.2 plus Employee Contributions (which is then

adjusted for payment prior to age 65 and potential conversion to a Joint and Survivor benefit

form).  Defendants argue that both eligibility and the amount of the residual annuity is

determined by comparing the Age 65 AE of LS paid with only the Grandfathered Benefit.  All

agree that if the Age 65 AE of LS paid is smaller than the second amount, then the difference is

the RAA Annuity benefit.  Based on a plain reading of the RAA, Plaintiffs are correct.

The RAA states, regarding eligibility to receive the RAA Annuity, that

[e]ffective as of July 1, 1989, a Member who, under any of Appendices B, C or D,
is entitled to a greater benefit than [her] Accrued Benefit . . . and who chooses to
receive [her] benefit under this Lump Sum Payment Option, which is the Actuarial
Equivalent of [her] Accrued Benefit . . . shall receive in addition to such lump sum
payment an additional benefit, commencing at the same time and payable in the

standard form applicable to such Member . . . . A Member may not elect any other form of payment option with respect to this additional benefit.

(Dkt. No. 21-3 at 4/8).  But the following provision of the RAA directs how to compute

the RAA Annuity:

> Such additional benefit shall be computed by subtracting the age 65 single life annuity Actuarial Equivalent amount of the Member's lump sum payment [i.e., the Age 65 AE of LS paid] from *the age 65 single life annuity benefit otherwise payable to the Member under Appendices B, C or D, as applicable* . . . .

> (Dkt. No. 21-3 at 4/8) (emphasis added).

The parties agree that Appendix C § 2(b) is the Appendix applicable to McCutcheon.  It states:

> If [she] elects to receive an annuity settlement instead of a single lump sum payment, [she] shall be eligible for an annuity pursuant to Section 6.2 . . . , Section 6.3 . . . or Section 6.4(a)(ii) . . . of the Plan that provides for [her] to receive *the larger of*:

> (i)      the benefit that [she] would have received had [she] continued under the Plan as in effect prior to July 1, 1989, pursuant to Appendix B . . . or

> (ii)     the benefit payable pursuant to Section 6.2 . . . Section 6.3 . . . or Section 6.4(a)(ii) . . . of the Plan, which is the Actuarial Equivalent of the Member's Accrued Benefit . . . plus [her] Contributions to Maintain Prior Plan Benefits with interest . . . at [her] Benefit Commencement Date.

(Dkt. No. 21-10 at 18-19/71).  Defendants argue that only § 2(b)(i) (which is the

Grandfathered Benefit) should be compared to the Age 65 AE of LS paid.  Plaintiffs

argue that the *greater* of § 2(b)(i) (the Grandfathered Benefit) *or* § 2(b)(ii) above should

be compared to the Age 65 AE of LS paid.

The Plan plainly states that Participants are entitled "to receive the larger of" the two

amounts, paragraph (i) the Grandfathered Benefit, and paragraph (ii) another amount discussed

below.  The Plan unambiguously directs that both amounts must be considered, as Plaintiffs

14

assert.  Defendants' interpretation to the contrary is erroneous as a matter of law.[2]

Defendants agree that the language governing determination of the RAA Annuity payments is clear and unambiguous, but argue that the RAA dictates a comparison between the PRA lump sum payment (expressed as an annuity) and the Grandfathered Formula annuity only. Defendants assert that "the age 65 single life annuity benefit *otherwise payable* to the Member under Appendices B, C or D, as applicable" refers only to the Grandfathered Benefit.  The other benefit, in Appendix C § 2(b)(ii), they argue is not "otherwise payable" because it is the same as the PRA lump sum payment, which was already paid.

This argument is unpersuasive because the PRA lump sum is not the same as the Appendix C § 2(b)(ii) benefit.  The PRA lump sum is more precisely "the age 65 single life annuity Actuarial Equivalent amount of the Member's lump sum payment" (i.e., the Age 65 AE of LS paid) from the RAA.  That amount is different from "the benefit payable pursuant to Section 6.2 . . . Section 6.3 . . . or Section 6.4(a)(ii) . . . of the Plan, which is the Actuarial Equivalent of the Member's Accrued Benefit . . . plus [her] Contributions to Maintain Prior Plan Benefits with interest" from Appendix C § 2(b)(ii).

First, on the most basic level, the words are different, suggesting that the drafters of the Plan meant to indicate two different things.  Second, the Age 65 AE of LS paid is a computational construct created solely to facilitate the computation under the RAA.  It is not a Plan benefit; there is no such benefit in the Plan.  In contrast, Appendix C § 2(b)(ii) creates by its terms an actual Plan benefit, established when the Plan was converted from a defined benefit

---

[2] Defendants' additional arguments regarding the meaning of the "as applicable" language in the RAA are rejected.  (Dkt. No. 281 at 7-9/14).  The "as applicable" language in the RAA is an unambiguous direction to the Plan Administrator to determine and identify which part of the Appendix applies to a given Participant before calculating her RAA Annuity.

plan to a PRA cash balance plan.

Third, a critical difference that flows from this distinction, and the reason the amounts are not the same, is that they are based on different interest rate assumptions. The Age 65 AE of LS paid is based on a PBGC interest rate, while the Appendix C § 2(b)(ii) benefit uses the higher 20+1% rate. The Age 65 AE of LS paid is based on a PBGC interest rate because, at the time of the adoption of the Plan in 1989, until February 28, 2002, the interest rates that IRC § 417(e) required the Plan to use in present valuing benefits were a blend of interest rates equal to the PBGC rate for immediate or deferred annuities. I.R.C. § 417(e)(3)(A)(ii)(II) (current version at I.R.C. § 417(e)(3)(C)); I.R.S. Notice 87-20, 1987-1 C.B. 456 (Feb. 9, 1987). Defendants admit in their reply memorandum that the Committee "uses the PBGC rates to convert the PRA Formula lump sum into an annuity for purposes of comparison with the Grandfathered Formula annuity." Defs. SJ Reply (Dkt. No. 249) ("Defs. SJ Reply") at 10 n.5.

In contrast, the Appendix C § 2(b)(ii) benefit, which is an actual benefit, is based on the higher 20+1% rate because that is the interest rate assumption in the Plan that Defendants actually used (for Participants paid before March 1, 2002) to project to an age sixty-five account value and then convert it to an age sixty-five annuity. As reflected in the 2003 Plan document, the Plan required the use of 20+1% rate to convert a Participant's Account into a single life annuity in § 1.3, before the year 2000 (and, indeed, through February 28, 2002, as explained above). Throughout the relevant period, this rate was always greater -- i.e., not the same as -- the PBGC rates.

Defendants' argument in response falls short. They assert that the Age 65 AE of LS paid and Appendix C § 2(b)(ii) benefit are one and the same. Defs. SJ Reply at 10-11; Defs. SOF ¶¶ 29-30 and 32. They do not explain how this can be, given that the two amounts are based on

different interest rates, nor do they appear to challenge that they use the PBGC rate for the former, while the Plan throughout the relevant period dictates use of the 20+1% rate for the latter.  Defendants also cite evidence to show that the RAA's purpose and intent was to ensure that Participants were "made whole" by comparing their Age 65 AE of LS paid just to the Appendix C § 2(b)(i) Annuity Benefit (to preserve the Grandfathered Formula benefit).  They similarly argue that the Committee's past practice is consistent with their interpretation.  But the unambiguous language of the RAA and Appendix C forecloses consideration of extrinsic evidence such as intent and purpose or past practice.  *See Aeronautical Indus. Dist. Lodge 91 of Int'l Ass'n of Machinists & Aerospace Workers, AFL-CIO v. United Techs. Corp., Pratt & Whitney*, 230 F.3d 569, 576 (2d Cir. 2000) ("Only when provisions are ambiguous may courts look to extrinsic factors . . . such as bargaining history, past practices, and other provisions . . . to interpret the language in question."); *DeVito v. Hempstead China Shop, Inc.*, 38 F.3d 651, 654 (2d Cir. 1994) (noting that "[t]o the extent that [an] *ambiguity exists*, a textual analysis of the Agreement may be supplemented by an exploration of extrinsic evidence concerning the parties' intent" (emphasis added)).

Even if not foreclosed by the Plan's unambiguous language, Defendants cannot support their argument regarding consistent prior practice, *see* Defs. SJ Reply at 9-10, since they admitted that there was no practice regarding the determination of the Residual Annuity for participants who were paid prior to the effective date of the 2003 Plan when the actuarial basis for determining the Account plus Employee Contributions benefit differed from the actuarial basis for determining the Age 65 AE of LS paid (i.e. when the Plan § 1.3 actuarial equivalence 20+1% interest rate exceeded the applicable IRC § 417(e) rate).  *See* Leonard Rep. ¶ 191 & n.18, and the sole evidence that Defendants cite in their reply to support their argument is a set of

calculations that predate the RAA by almost a year and hence are not actual RAA benefit calculations.

Defendants also argue that different interest rates (in this case the PBGC rate on the one hand and the 20+1% rate on the other) cannot be used in the same benefit calculation. Defs. SJ Br. at 24-25. But Defendants have admitted that it is standard practice in a cash balance plan to use a different rate for projecting the account to age 65 than is used for calculations that are subject to IRC § 417(e). Defs. SJ Br. at 25-26; Defs. SOF ¶¶ 18-19; Leonard Rep. ¶¶ 47, 49.

Defendants' expert argues that IRC § 417(e) does not apply here because IRC § 417(e) does not apply at all when the benefit is partially paid as a lump sum and partially paid as an annuity. Leonard Rep. ¶¶ 22, 178-79. This argument is unpersuasive because he relies on an IRS notice that was issued after the calculations in question were performed. *See* I.R.S. Notice 2017-44. Also, the IRS notice by its terms (and as explained by Plaintiffs' expert) does not appear to apply to the benefit here. *See* 6/24/19 Reply Report of Lawrence Deutsch (Dkt. No. 262) ("Deutsch Reply Rep.") at 15 (explaining that the notice also would have required that the Plan be timely amended, to apply to benefits that commenced prior to 2017, which the Plan was not). Plaintiffs' expert further pointed out that application of the IRS Notice would actually serve to increase, rather than decrease, the amount of the Residual Annuity. *Id*. at 17.

Defendants raised reformation as a defense in their Answer (*see* Dkt. No. 49 at 123/125) and in their summary judgment motion (*see* Dkt. No. 236 at 33/42), arguing that the Plan should be reformed to produce the desired result. Defendants' reformation defense is rejected as a matter of law. Defendants seek to reform the Plan to "reflect the drafters' intent" that the Residual Annuity be based only upon the Grandfather benefit and say what they argued in their summary judgment motion, which the Court rejected as contrary to the plain meaning of the

Plan: if the value of a Participant's Appendix C § 2(b)(i) annuity benefit (which is the

Grandfathered Benefit) was greater than the value of the annuitized form of her PRA lump sum

payment, the Participant would receive an RAA Annuity in the amount of the difference (*see*

Dkt. No. 236 at 33-34/42). This argument is rejected because, so reformed, the Plan would be in

violation of IRC § 417(e), which requires any lump sum payment to be no less than the actuarial

equivalent of the Participant's accrued benefit expressed as a single life annuity payable at

normal retirement age. I.R.C. § 417(e); *accord Esden*, 229 F.3d at 164. As explained above, the

discount rate to determine the present value of the accrued benefit (annuity) is prescribed by IRC

§ 417(e), which at the relevant time was the PBGC rate. *See* Dkt. No. 265 at 22/32. If reformed

as Defendants request, this discount rate would be the 20+1% rate, which at the relevant time

was higher than the PBGC rate and therefore, if applied, would be in violation of IRC § 417(e).

The Court declines to reform a plan provision that conforms to controlling law into a plan

provision that would violate the law. In no case that Defendants cited were the relevant plan

terms after reformation contrary to law.

Reformation is unavailable to Defendants for the additional reason that reformation is not

a defense but rather an affirmative claim that Defendants failed raise as a counterclaim. *See* 29

U.S.C. § 1132(a)(3) ("A *civil action* may be brought . . . by a . . . fiduciary . . . to obtain other

appropriate equitable relief." (emphasis added)); *In re DeRogatis*, 904 F.3d 174, 199 (2d Cir.

2018) (noting that "plaintiffs *asserting a claim* under [ERISA] section 502(a)(3) may seek

remedies such as . . . equitable reformation of plan terms" (emphasis added)); *Scarangella v.

Grp. Health, Inc.*, 731 F.3d 146, 149 (2d Cir. 2013) (discussing the three *counterclaims*, brought

by defendant in response to plaintiff's complaint, "seeking rescission and/or reformation" of the

plan (emphasis added)); *see also Powermat Techs., Ltd. v. Belkin Int'l Inc.*, No. 19 Civ. 878,

2020 WL 2892385, at *7 (S.D.N.Y. Apr. 2, 2020) (addressing whether, under New York law, defendant had adequately pleaded reformation as a *counterclaim* and the corresponding *defense* of mutual mistake).  Defendants have not identified any Second Circuit case that supports asserting reformation only as a defense, nor have they identified any persuasive out-of-Circuit case where a court has allowed a defendant to reform an ERISA plan in this context in the manner they suggest.

Second, while Defendants suggest reformation is an absolute plan sponsor right under ERISA, *see, e.g.*, Defs. 7/27/20 Ltr. at 1 (Dkt. No. 273), reformation is appropriate only in extreme cases, and in substantiating an intent contrary to the clear and unambiguous plan's terms, the defendant must meet the high bar of clear and convincing evidence relying only on objective, written evidence that is "not dependent 'on the credibility . . . of an interested party.'" *Young v. Verizon's Bell Atlantic Cash Balance Plan*, 615 F.3d 808, 820 (7th Cir. 2010). Defendants fail to explain how the situation here is an extreme case: Defendants claim "windfall," Dkt. No. 273 at 2, but it is no windfall for participants to receive a make-whole payment following a forfeiture of their legally indefeasible benefits.  Moreover, Defendants point to no objective, written extrinsic evidence showing that, when Colgate adopted the RAA in March 2005, the intention was to cure the IRC § 417(e) violations visited upon a specific group of Appendix benefit participants (those with greater Grandfathered formula benefits) but to repeat the IRC § 417(e) violations inflicted on the other Appendix benefit participants (those with greater Appendix C § 2(b)(ii) benefits).  The evidence to which Defendants point includes the December 2004 Committee minutes, which indicate that Colgate's intent included compliance with the regulation, which would require basing the Residual Annuity upon the entire benefit, not just the Grandfather benefit.  Thus, Defendants have not identified admissible

20

evidence that creates a genuine issue of material fact establishing that Colgate had, as of the March 2005 adoption date, an affirmative intention to repeat its prior Appendix Account-based underpayments.

Accordingly, Plaintiffs are entitled to summary judgment on Error 1.

## B.    Error 3

In Error 3, Plaintiffs argue that Defendants improperly used a pre-retirement mortality discount ("PRMD") to determine a Class Member's RAA Annuity in the calculation of the age sixty-five actuarial equivalence for the period prior to age sixty-five (normal retirement age). Unlike Error 1, which applies only to Class members paid prior to the effective date of the 2003 Plan, Error 3 applies to all calculations under the RAA, including participants who were paid a Residual Annuity prior to 2014.  Plaintiffs do not dispute that the PRMD is called for by the Plan.  Instead they argue that Defendants' use of PRMD violates the law -- ERISA § 203(a)(2) and IRC § 417(e)'s actuarial equivalence rules.  As a question of law, the Court reviews Error 3 de novo.  *See Wilkins v. Mason Tenders Dist. Council Pension Fund*, 445 F.3d 572, 581 (2d Cir. 2006) ("The interpretation of ERISA, a federal statute, is a question of law subject to *de novo* review."); *accord Munnelly v. Fordham Univ. Faculty*, 316 F. Supp. 3d 714, 727 (S.D.N.Y. 2018).  For the following reasons, summary judgment is granted to Plaintiffs on Error 3.

As a threshold matter, Defendants do not oppose Plaintiffs' arguments regarding Error 3 in their opposition brief.  (*See* Dkt. No. 281).  Summary judgment is granted on this ground alone.  *See Vermont Teddy Bear Co. v. 1-800 Beargram Co.*, 373 F.3d 241, 244 (2d Cir. 2004) ("[I]f a non-moving party fails to oppose a summary judgment motion, then summary judgment, *if appropriate,* shall be entered against him." (internal quotation marks omitted)).

A mortality discount factors into the present value of a benefit -- here an age sixty-five

single life annuity -- the possibility that the participant might die before the projected end date of the benefit, here age sixty-five.  For example, a plan could determine the present value of a benefit by projecting the cash balance account forward to age sixty-five and then discounting the account back to the participant's current age, and then applying a further mortality discount. The amount of the discount is taken from the plan's applicable mortality table.[3]

Plaintiffs argue that a mortality discount should not be used to determine the present value of a normal retirement annuity when, as prescribed by the Plan, the ultimate benefit paid does not significantly decrease if the participant dies before normal retirement age (i.e., the benefit payable to the beneficiary upon death is not significantly less than what would have been paid to the participant upon survival), as is the case here.  Plaintiffs cite multiple out-of-Circuit cases, which have found an IRC § 417(e) violation in similar circumstances.  *See West v. AK Steel Corp.*, 484 F.3d 395, 411 (6th Cir. 2007) (agreeing with the district court that applying a mortality discount to reduce the present value of a pre-retirement lump-sum distribution where the death benefit is equal to the participant's pension benefit would create an impermissible forfeiture under ERISA); *Berger v. Xerox Corp. Ret. Income Guarantee Plan*, 338 F.3d 755, 764 (7th Cir. 2003) (affirming and observing that the use of a pre-retirement mortality discount was "unfathomable" because the participant's death would not reduce his benefits); *Ruppert v. Alliant Energy Cash Balance Pension Plan*, No. 08 Civ. 127, 2010 WL 5464196, at *2, 16-18 (W.D. Wis. Dec. 29, 2010); *Crosby v. Bowater Inc. Ret. Plan For Salaried Emps. of Great N. Paper, Inc.*, 212 F.R.D. 350, 360-62 (W.D. Mich. 2002), *vacated on other grounds*, 382 F.3d 587 (6th Cir. 2004).  The rationale is that "applying a pre-retirement mortality discount to a

---

[3] This example is merely illustrative and focuses on an individual who, like McCutcheon, received benefits prior to 2006 and the enactment of the Pension Protection Act.

retirement benefit that does not decrease if the participant dies would result in a lump sum that was less than the actuarial equivalent of the annuity it [was] supposed to replace" and therefore would "result in a forfeiture prohibited by ERISA."  *West v. AK Steel Corp. Ret. Accumulation Pension Plan*, No. 02 Civ. 0001, 2005 WL 3465637, at *5 (S.D. Ohio Dec. 19, 2005) (internal quotation marks omitted), *aff'd sub nom.*, *West*, 484 F.3d 395.

This reasoning is persuasive.  As applied to this case, no PRMD should be used to determine a Class Member's RAA Annuity in the calculation of the age sixty-five actuarial equivalence for the period prior to age sixty-five because the death benefit is defined as "the Actuarial Equivalent of the Accrued Benefit" in § 5.1(a) of the Plan.  Under 26 C.F.R. § 1.417(e)-1, "[t]he present value of any optional form of benefit cannot be less than the present value of the normal retirement benefit determined in accordance with the preceding sentence." 26 C.F.R. § 1.417(e)-1.  Here, a PRMD is used to determine the present value of the Age 65 AE of LS paid -- a benefit that must be paid in all events and does not decrease if the Participant dies prior to reaching age sixty-five.  This results in a present value that is less than the corresponding normal retirement benefit and therefore violates 26 C.F.R. § 1.417(e)-1.  *See West*, 484 F.3d at 411; *Berger*, 338 F.3d at 764.  Therefore, a PRMD should not be applied.

Defendants argue that a proposed 2016 IRS regulation explicitly rejects Plaintiffs' argument regarding the unlawful use of a PRMD in this context, with citation to the same cases upon which Plaintiffs rely.  *See* Update to Minimum Present Value Requirements for Defined Benefit Plan Distributions, 81 Fed. Reg. 85,190 (proposed Nov. 25, 2016) (to be codified at 26 C.F.R. pt. 1).  Defendants also argue that the IRS approved the Plan's use of PRMD in 2003, when it qualified the Plan, that this interpretation should be entitled to deference, and that the Second Circuit has separately held that IRS interpretations are entitled to deference.

While Defendants are correct that proposed regulations may provide guidance, they are not binding.[4]  *See LeCroy Research Sys. Corp. v. Comm'r*, 751 F.2d 123, 127 (2d Cir. 1984) ("Proposed regulations are suggestions made for comment; they modify nothing."); *accord Sweet v. Sheahan*, 235 F.3d 80, 87 (2d Cir. 2000) ("Implicit in our argument is the established point of law that proposed regulations . . . have no legal effect.").  The Second Circuit case on which Defendants rely for the proposition that IRS interpretations are entitled to deference involves an IRS regulation that was adopted, rather than merely proposed.  *See Hurwitz v. Sher*, 982 F.2d 778, 782 (2d Cir. 1992) (addressing 26 C.F.R. § 1.401(a)-20, effective March 24, 2006).

Further, the proposed regulations cited by Defendants appear to support Plaintiffs' position.  They would update existing regulations for minimum present value requirements for defined benefit plan distributions, including the treatment of preretirement mortality discounts in determining the minimum present value of accrued benefits.  *See* Update to Minimum Present Value Requirements for Defined Benefit Plan Distributions, 81 Fed. Reg. at 85,192.  As relevant here, according to the proposed regulations, the probability of death (under the applicable mortality table) during an assumed deferral period, if any, would not be taken into account for purposes of determining the present value under IRC § 417(e)(3) of an accrued benefit derived from contributions made by an employee.  *Id*.  This is because, according to the proposed regulations, an employee's rights in the accrued benefits from the employee's own contributions

---

[4] The proposed regulations were published on November 25, 2016, and have not become final since.  *See* Update to Minimum Present Value Requirements for Defined Benefit Plan Distributions, 81 Fed. Reg. 85,190 (proposed Nov. 25, 2016) (to be codified at 26 C.F.R. pt. 1). Written and electronic comments were submitted by February 23, 2017, and discussed at a public hearing on March 7, 2017.  *Id*.

are non-forfeitable under IRC § 411(a)(3)(A), and the exception for death under IRC §

411(a)(3)(A) to the non-forfeitability of accrued benefits does not apply to the accrued benefit

derived from employee contributions. *Id.* In other words, the proposed regulation appears to

forbid the application of a PRMD to determine the present value of the entire accrued benefit if

any portion of the accrued benefit is derived from contributions made by the employee, as is the

case here.

For these reasons, summary judgment is granted to Plaintiffs on Error 3.

## IV.    ORDER DIRECTING RECALCULATION OF BENEFITS

Having found Plaintiffs entitled to summary judgment on Errors 1 and 3, but Defendants

entitled to judgment on Errors 2 and 4, the Court directs Defendants to calculate or recalculate, in

a manner consistent with this Opinion, all Residual Annuities for each member of the Class and

pay the corrected Residual Annuity. For avoidance of doubt, Defendants' arguments objecting

to the use of the 20+1% interest rates to determine the Projection rate, and the use of the PBGC

rates to determine the Age 65 AE of LS paid, are rejected for the reasons discussed above.

Accordingly,

- The Projection Rate (used to convert the cash balance into an age sixty-five annuity for Participants younger than sixty-five) is the 20+1% rate if the Original Payment Date is prior to March 1, 2002.

- The IRC § 417(e) Rates shall be used in calculating the Age 65 AE of LS paid ("the age 65 single life annuity Actuarial Equivalent amount of the Member's lump sum payment" per the RAA) and are the PBGC interest rates in effect on the Original Payment Date if the Original Payment Date is prior to March 1, 2002.[5]

---

[5] Defendants assert that the PBGC rates should cease to apply as of January 1, 2000, based on an effective date of a cited change to IRC § 417(e). This argument is rejected. The change, effective January 1, 2000, did not prohibit the use of the PBGC rates past that date, but rather allowed the Plan to be amended as of that date to replace the PBGC rates; and if the Plan failed

## V.        ENTRY OF JUDGMENT UNDER RULE 54(b)

As with Error 3, Defendants do not oppose Plaintiffs' entry of judgment under Rule 54(b) of the Federal Rules of Civil Procedure and therefore summary judgment is granted on this ground alone.  *See Vermont Teddy Bear Co.*, 373 F.3d at 244.  In the alternative, summary judgment is also granted to Plaintiffs on the merits of the argument.

Rule 54(b) permits entry of a final judgment as to fewer than all claims or parties if the court finds that "there is no just reason for delay."  Fed. R. Civ. P. 54(b).  That is the case here because while there is one technically unadjudicated claim -- Plaintiff McCutcheon's individual Count II, Error 4 anti-cutback claim, to be reviewed de novo, *see McCutcheon*, 2020 WL 3893303, at *16 (noting that the Court has not decided "which party has the better argument" on her individual claim, reviewed de novo) -- that too has effectively been resolved with the Court's grant to Defendants of summary judgment on the Class's Error 4 claim (reviewed deferentially) because, as discussed in Plaintiffs' July 21 letter to the Court (Dkt. No. 267), Plaintiff waives any right to de novo review of her Error 4 claim based on Defendants' mishandling of her administrative claim and appeal, and, like the Class, limits her contention to that which the Class would make on appeal, namely, that her/their entitlement to de novo review of her/their Error 4 cutback claim is because it centers on a question of law rather than an interpretation of the Plan. In other words, by her agreement, Plaintiff's individual Error 4 claim merges in its entirety into

---

to be amended by January 1, 2000, then the Plan was required to provide the better of the PBGC rate and the 30-year Treasury rate.  *See* Pub. L. 103-465 § 767(a)(2); Deutsch Rep. ¶¶ 25-26. Since the Plan was not amended until 2002, the Plan was required to pay no less than the better of the benefit determined using PBGC rates and the 30-year Treasury Rate.

the Class's claim in all respects including for purposes of appeal, leaving nothing more to be decided here.

This case is thus suitable for certification under Rule 54(b) because this case is, in every practical sense, at an end and ready in its entirety for appellate review, there is no need for the Court to reach the merits of Error 4 reviewed de novo and there is no chance of piecemeal appeals.  This makes certification under Rule 54(b) in the "interest[s] of sound judicial administration and efficiency."  *Curtiss-Wright Corp. v. Gen. Elec. Co.*, 446 U.S. 1, 8 (1980); *accord Harriscom Svenska AB v. Harris Corp.*, 947 F.2d 627, 629 (2d Cir. 1991).

## VI.   CONCLUSION

For the foregoing reasons, Plaintiffs' motion is GRANTED.  The relief provided in this Opinion, Order and Final Judgment is stayed to allow the parties to pursue an appeal. Defendants' request for oral argument (Dkt. No. 283) is DENIED as moot.

The Clerk of Court is respectfully directed to close the motion at Docket No. 278.

Dated: August 24, 2020
New York, New York

LORNA G. SCHOFIELD
UNITED STATES DISTRICT JUDGE