UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------------ x
REBECCA M. MCCUTCHEON, et al.,    :
                                                            :    16-cv-4170 (LGS)
                               **Plaintiffs,**    :
       v.                                         :    **[PROPOSED]**
                                                        :    **ORDER AND**
                                                        :    <u>**REVISED FINAL JUDGMENT**</u>
                                                        :
**COLGATE-PALMOLIVE CO., et al.,**    :
                                                        :
                              **Defendants.**    :
------------------------------------------------------------ x

LORNA G. SCHOFIELD, District Court:

       Upon consideration of Plaintiffs' and the Class's motion for entry of a revised final judgment as to Count II, Errors 1 and 3 of the Complaint, Defendants' opposition thereto and the entire record herein, for the reasons set forth in Plaintiffs' motion, Plaintiffs' motion is GRANTED.

       There are two calculation issues that remain in dispute following the Second Circuit's affirmance in *McCutcheon v. Colgate-Palmolive Co.*, 62 F.4th 674 (2d Cir. 2023) ("*McCutcheon II*") of this Court's grant of summary judgment in favor of Plaintiffs and the Class ("Plaintiffs") on Errors 1 and 3 of the Complaint.

       Both issues – namely, (1) the "20+1%" interest rate issue and (2) the pre-retirement mortality discount ("PRMD") issue – have already been decided in Plaintiffs' favor by both this Court and the Court of Appeals, were not challenged by Defendants on appeal and therefore cannot now be revisited under the law of the case doctrine and its subsidiary, "mandate rule." Moreover, both issues were correctly decided in Plaintiffs' favor.

### I. The Portion of the Appendix C § 2(b)(ii) Account-Based Benefit Attributable to Employee Contributions Must Be Calculated Using the 20+1% Rate

The first disputed issue concerns what interest rate should be used to calculate the benefit attributable to employee contributions when determining Class members' Appendix C § 2(b)(ii) Account-plus-Employee Contribution benefit. *See* Dkt. 21-10 at 75-76, PDF 18-19/71 (defining the participant's § 2(b)(ii) benefit as her Account-based annuity "**plus** [her annuity based on her] Contributions to Maintain Prior Plan Benefits with interest (determined in the same manner as the Interest Credits pursuant to Section 3.4) (Interest Credits) of the Plan") (emphasis added). The parties agree that under this Court's and the Second Circuit's rulings, *see McCutcheon II*, 62 F.4th at 695-96; *McCutcheon v. Colgate-Palmolive Co.*, 481 F.Supp.3d 252, 257, 264-65, 269 (S.D.N.Y. 2020) ("*McCutcheon I*"), the portion of the § 2(b)(ii) Account-based benefit **not** attributable to employee contributions must be calculated using the 20+1% rate in accordance with Plan § 1.3's definition of Actuarial Equivalent, but Defendants assert that these rulings do not apply to the portion of the § 2(b)(ii) benefit attributable to employee contributions and that the Plan does not have a provision for the projecting and converting of employee contributions into an annuity payable under § 2(b)(ii). Defendants maintain that a statutory provision—ERISA § 204(c)(2), IRC § 411(c)—directs that employee contributions **must** be projected and converted into annuity benefits using 417(e) rates.

These contentions are wrong, are foreclosed by this Court's and the Second Circuit's rulings and the mandate rule, are in direct conflict with Defendants' Fed. R. Civ. P. 30(b)(6) admissions as to how the portion of the § 2(b)(ii) benefit attributable to employee contributions should be and were projected and converted into annuity benefits under § 2(b)(ii) prior to 2003, and are also directly contrary to how Defendants showed participants their § 2(b)(ii) benefits were properly calculated.

Prior to summary judgment, Defendants and their actuarial consultant admitted, and Plaintiffs independently proved, that in determining the § 2(b)(ii) benefit prior to 2003, Defendants made no distinction between the account attributable to employer and employee contributions when converting the account into an annuity, and consistently projected and converted the entire account – *i.e.*, both employer and employee contributions – into an age 65 annuity using the Plan § 1.3 Actuarial Equivalent 20+1% rate.  *See* Deutsch Rep. (Dkt. 263) at ¶ 33, ¶¶ 71-75, ¶¶ 79-96 (proving, for example, that Defendants converted Ms. McCutcheon's, Mr. Cross', Mr. Carroll's and Mr. Ramaswami's entire account at the 20+1% rate – both employer and employee contributions – when determining their § 2(b)(ii) annuities); Morgan 5/2/19 Tr. (Dkt. 242-1) 481:18-23, 491:12-496:16, 497:18-498:13, 564:12-566:9 (Defendants' actuarial consultant admitting Defendants converted Mr. Ramaswami's entire account at the 20+1% rate); Defs. 30(b)(6) 4/25/19 Tr. (Dkt. 242-1) 351:11-14, 352:16-353:7 (Defendants admitting, through their Fed. R. Civ. P. 30(b)(6) designee, that "employee contributions [were] treated the same way as employer contributions for purposes of computing the PRA annuity"; again admitting "they were treated the same for purposes of converting the account and the employee contributions into a payable annuity benefit"); 4/26/19 Tr. 463:21-464:8 (also admitting that the account converted at the 20+1% rate includes employee contributions).

The reason that Defendants thus made no distinction between employer and employee contributions and consistently projected and converted the entire account into an age 65 annuity using the 20+1% rate was because that is what the pre-2003 Plan said to do:  Appendix § 2(b)(ii) defined the combined annuity, *i.e.*, comprised of both employer and employee contributions, as the "benefit payable pursuant to Section 6.2 . . .  which is the Actuarial Equivalent of the Member's Accrued Benefit …. plus his Contributions," (emphasis added) – meaning the

3

§ 2(b)(ii) annuity is the Actuarial Equivalent (determined per Plan § 1.3 at 20+1% rate) of the Accrued Benefit **plus** employee contributions. Because the employee contributions must be paid as an annuity under § 2(b)(ii)—because the annuity is the election under § 2(b)(ii)—the only way to read this mathematically and have it make any sense is that "Actuarial Equivalent" modifies both "Accrued Benefit" *and* "[Employee] Contributions." Thus, the § 2(b)(ii)) benefit is the Actuarial Equivalent of the accrued benefit plus the Actuarial Equivalent of the employee contributions, *i.e.*, the employee contributions must be converted to an annuity using the 20+1% rate in Plan § 1.3 (because that is the definition of Actuarial Equivalent).[1]

During summary judgment, in addition to proving that this was how Defendants interpreted and applied the Plan prior to 2003, Plaintiffs also proved that this is also how Defendants communicated to participants that their § 2(b)(ii) benefits were properly calculated. *See, e.g.*, Pls. Opp. to Defs. SJ Mtn. (Dkt. 241) at 11-13, 17-18; Pls. Resp. to Defs. SOF (Dkt. 243) ¶ 18, 132-39 and Pls. SJ Ex. 20, TWC000013253-58 (Dkt. 242-20); Deutsch Rep. ¶¶ 87-90; Deutsch Reply (Dkt. 264) at 4-7, 20, 28.

Accordingly, when the issue came before the Court for decision on summary judgment, this Court held that Defendants are obligated to use the 20+1% rate when calculating Appendix

---

[1] Defendants' suggestion that the Plan does not have a provision for the projection and conversion of employee contributions into an annuity does more than just conflict with the terms of the Plan and Defendants' own consistent prior interpretation and application of the Plan: if true, it "would render the plan unlawful," *McCutcheon II*, 62 F.4th at 697, as the Second Circuit already found when rejecting Defendants' almost identical argument that the Plan has no provision for projecting account balances to age 65. Failure of the Plan to have a provision to convert the employee contributions into an age 65 annuity would be illegal for the same reason identified in *McCutcheon II*—namely, if "the Plan contains no instructions for calculating the accrued benefit for anyone under the age of 65," "[t]his omission would render the Plan unlawful because I.R.C. § 401(a)(25) requires that a participant's accrued benefit be 'definitely determinable.'" *McCutcheon II*, 62 F.4th at 697. As the Second Circuit explained: "'[C]ontracts should not be interpreted to render them illegal and unenforceable where the wording lends itself to a logically acceptable construction that renders them legal and enforceable.'" *Id.* Here, because it is a logically acceptable construction of § 2(b)(ii)) to read it as requiring application of the Plan's 20+1% Actuarial Equivalent definition in Plan § 1.3 to both "Accrued Benefit" *and* "[Employee] Contributions," that is how it must be read.

4

C § 2(b)(ii) benefits because, as the Court explicitly found, pre-2003 that was "the actuarial basis for determining the Account plus Employee Contributions benefit" and "that is the interest rate assumption in the Plan that Defendants actually used (for Participants paid before March 1, 2002) to project to an age sixty-five account value and then convert it to an age sixty-five annuity." *McCutcheon I*, 481 F.Supp.3d at 264-65.  Indeed, this Court repeatedly found that the Appendix C § 2(b)(ii) benefit as a whole—not merely the Accrued Benefit but the Accrued Benefit *plus* the Employee Contributions benefit—has to be calculated at the 20+1% rate.  *See id.* (for purposes of calculating "Appendix C § 2(b)(ii) benefit. . . .the Plan throughout the relevant period dictates use of the 20+1% rate"; "the Appendix C § 2(b)(ii) benefit uses the higher 20+1% rate").

Accordingly, it would have been obvious to Defendants that, if not overturned, this ruling would obligate them to project and convert employer and employee contributions identically at the 20+1% rate when determining Class members' winning § 2(b)(ii) benefits.  *See also id.* at 269 ("Having found Plaintiffs entitled to summary judgment . . . the Court directs Defendants to calculate or recalculate, **in a manner consistent with this Opinion**, all Residual Annuities for each member of the Class and pay the corrected Residual Annuity") (emphasis added).  Yet far from challenging this aspect of the Court's ruling, Defendants on appeal made no distinction whatsoever between employer and employee contributions and nowhere argued that the Employee Contributions portion of the Appendix C § 2(b)(ii) benefit could or should be calculated at any rate other than the rate this Court found to be required.  *See* Pls. Ex. 3, Defs. 5/10/21 2d Cir. Br. (2d Cir. Dkt. 74), *passim*.

To the contrary, while Defendants argued against application of the 20+1% rate as the projection rate, they *accepted* it as the conversion at age 65 rate and made no distinction

5

whatsoever between employer and employee contributions for either projection or conversion purposes. *Id.*, *passim*. In other words, Defendants never disputed that employee contributions had to be projected and converted to an annuity at age 65 at whatever rate (including the 20+1% rate, if decided adversely to them) employer contributions were projected and converted to an annuity at age 65. *Id.* In essence, on appeal, Defendants conceded that if they lost the 20+1% rate issue, they lost that issue for both employer and employee contributions. *Id.*

Further proving that Defendants agreed that there should be no distinction in the treatment of the two different types of inputs of the combined 2(b)(ii) annuity benefit, Defendants interchangeably referred to the entire § 2(b)(ii) annuity—which is defined as the portion of the benefit attributable to employer contributions "plus" the portion attributable to employee contributions—*as* the "PRA annuity." *See, e.g.*, Defs. 2d Cir. Br. at 18 (participants are entitled to "the *greater* of the 'old' Grandfathered benefit and the 'new' 2(b)(ii) PRA Annuity," meaning the "§ 2(b)(ii) PRA annuity" is synonymous with the § 2(b)(ii) benefit as a whole) (emphasis by Defendants); *id.* at 27-28 (explicitly equating "the 'new' PRA annuity benefit" with "the 'new' 2(b)(ii) Annuity"); *id.* at 31 (chart defining "the 'new' PRA annuity" *as* the "Annuity" under "§ 2(b)(ii)").

The Second Circuit followed suit, beginning its analysis by explicitly finding that the "Appendix C § 2(b)" benefit under subpart "(ii)" is the "PRA annuity adjusted to *include* her contributions toward maintaining the grandfathered annuity." *McCutcheon II*, 62 F.4th at 679. In other words, the "PRA annuity" is synonymous with the § 2(b)(ii) benefit and includes the portion of the benefit attributable employee contributions. The Second Circuit again equated the "PRA annuity" with the § 2(b)(ii) benefit when explaining that participants' entitlement to "the greater of the grandfathered annuity (described in Appendix C § 2(b)(i)) and **the PRA annuity**

**(described in Appendix C § 2(b)(ii))**," *id.* at 696 (emphasis added), which again shows that, like Defendants, the Second Circuit treated "the PRA annuity" and § 2(b)(ii) benefit as one and the same. Accordingly, when it "affirm[ed] the district court's conclusion that Colgate is required to use of the 20+1% projection rate when calculating the Appendix C § 2(b)(ii) PRA annuity," the Second Circuit, like this Court, necessarily concluded that there should be no distinction in the treatment of the two different types of inputs of the combined 2(b)(ii) annuity. *Id.* at 697.

By now trying to argue that employee contributions must be projected and converted to an annuity at a rate other than the 20+1% rate, Defendants are attempting to litigate an issue that was squarely decided against them by this Court, that Defendants then elected to accept rather than challenge on appeal, and that the Court of Appeals explicitly affirmed adversely to them. Thus, for multiple reasons, Defendants have forfeited their right to argue that employee contributions must be projected and converted to an annuity at a rate other than the 20+1% rate.

"[T]he law of the case doctrine forecloses reconsideration of issues that were decided—or that could have been decided—during prior proceedings" in the same case. *United States v. Williams*, 475 F.3d 468, 471 (2d Cir. 2007). The mandate rule is a subsidiary rule of the law of the case doctrine. *See United States v. Ben Zvi*, 242 F.3d 89, 95 (2d Cir. 2001). The mandate rule "'compels compliance on remand with the dictates of the superior court and forecloses relitigation of issues expressly or impliedly decided by the appellate court.'" *Id*. "Likewise, where an issue was ripe for review at the time of an initial appeal but was nonetheless foregone, the mandate rule generally prohibits the district court from reopening the issue on remand." *Id*.

Here, it is clear that both the law of the case doctrine and the mandate rule foreclose litigation of the interest rate to be used for projecting and converting employee contributions.

The law of the case doctrine applies because that issue was squarely decided against Defendants by this Court in a decision affirmed by the Second Circuit. The mandate rule also applies and independently forecloses litigation of the issue because Defendants elected to not challenge this Court's ruling that the 20+1% rate was "the actuarial basis for determining the Account plus Employee Contributions benefit," "the Appendix C § 2(b)(ii) benefit [as a whole] uses the higher 20+1% rate" and for purposes of calculating "Appendix C § 2(b)(ii) benefit [as a whole] . . . the Plan throughout the relevant period dictates use of the 20+1% rate." *McCutcheon I*, 481 F.Supp.3d at 264-65.

Clearly, if Defendants thought that employee contributions should not, like employer contributions, be projected and converted at the 20+1% rate, they had the opportunity—and the obligation—to bring that to the attention of the Second Circuit. Instead, they did the opposite of alerting the Court of Appeals to the issue: they treated employee and employer contributions identically in the Court of Appeals, just as they did pre-2003 in calculating Class members' § 2(b)(ii) annuities. The issue is thus "considered waived," "barr[ing] the district court on remand . . . from reopening such issues." *United States v. Quintieri*, 306 F.3d 1217, 1229 (2d Cir. 2002). To hold otherwise would allow litigants to appellants to present challenges in a piecemeal and repeated fashion, and would lead to the untenable result that "a party who has chosen not to argue a point on a first appeal should stand better as regards the law of the case than one who had argued and lost." *Fogel v. Chestnutt*, 668 F.2d 100, 109 (2d Cir. 1981).[2]

---

[2] Even if the foregoing analysis is not dispositive of the matter, it is clear that what Defendants are trying to do now, by suggesting a lower rate for projecting and converting employee contributions into an annuity, is independently barred by *McCutcheon II*'s separate holding that after "inform[ing] [Class] members that their PRA annuities were worth a certain amount based on [the] 20+1% . . . rate," "Colgate cannot arbitrarily adopt a lower . . . rate to retroactively change those prior valuations." *Id.* at 697. This ruling clearly applies whether one is considering employer contributions, employee contribution, or both employer and employee contributions: here Defendants showed participants "that their PRA annuities were worth a certain amount based on [the] 20+1% . . . rate," treating their employer and employee

8

The Court also rejects Defendants' (new, belated) argument that ERISA § 204(c)(2), IRC § 411(c) somehow overrides the Plan document and Defendants' long-standing interpretation of it to **require** use of the 417(e) rate to convert employee contributions into annuity benefits at normal retirement. As Plaintiffs argue, ERISA § 204(c)(2), IRC § 411(c) merely values employee contributions for **vesting** purposes which is not in dispute here; ERISA § 204(c)(2), IRC § 411(c) has nothing to do with calculating the benefit due.

More specifically, ERISA § 204(c)(2), IRC § 411(c) provides that to the extent that a participant is less than 100% vested, his or her benefit is treated as having two parts, the employee purchased portion, which is always 100% vested and the employer purchased portion, which is subject to the vesting schedule. Additionally, the total plan benefit may not be less than the employee purchased benefit. Neither of those issues apply here. Indeed, as Defendants themselves acknowledged in their Second Circuit opening brief, "Section 411(c) addresses the allocation of a participant's accrued benefit between employee and employer contributions. As this Court observed, § 411(c) is 'simply inapposite' to the present value requirements of § 417(e) and the parallel provision in § 205(g) of ERISA. See Esden, 229 F.3d at 171." Defs. 2d Cir. Brief at 52 n.8. In other words, Defendants here acknowledged that ERISA § 204(c)(2), IRC § 411(c) applies for a very limited purpose and that the rates applied for that purpose do not apply for the actual determination of the benefit due.[3]

---

contribution inputs into those annuities identically. As the Second Circuit said, it is simply too late for Defendants "to retroactively change those prior valuations." *McCutcheon II*, 62 F.4th at 679.

[3] Defendants' related argument that "during the time period covered by this lawsuit, whipsaw did not apply to employee contributions on account of ERISA § 204(c)(2), IRC § 411(c)," Pls. Ex. 2, Defs. 5/11/23 email to Class counsel, is not only waived under the mandate rule, it is an unsupported assertion that directly conflicts with 417(e) which applies to the entire plan benefit and admits of no exceptions of relevance here.

9

In sum, even if the issue had not already been decided by this Court and the Court of Appeals or could be revisited now consistent with the mandate rule, there is simply no basis under the Plan document and Defendants' consistent prior interpretation, application and communication of the Plan to participants, for treating employee contributions any different than the employer contributions for purposes of determining the total benefit due.

## II. The Adjustment of the Residual Annuity from Age 65 to the Class Members' Age on the Original Payment Date Must Be Done Without Applying a PRMD

The second issue concerns the use of a pre-retirement mortality discount ("PRMD"): Defendants maintain that despite this Court's and the Second Circuit's ruling forbidding use of a PRMD, Defendants can use a PRMD when adjusting the age 65 residual annuity ("RA") due as of the Class member's age on his or her original payment date. *See* Pls. Ex. 1, Defs. 4/21/23 email to Class counsel; Pls. Ex. 2, Defs. 5/11/23 email to Class counsel. Again, Defendants are wrong on the merits and trying to re-litigate an issue that has already been decided against them by both this Court and the Court of Appeals and/or is foreclosed by the mandate rule and/or that Defendants have already waived.

This Court and the Second Circuit clearly ruled that a PRMD cannot be used in **any** calculations because "a member's pre-retirement death would have little or no effect on the value of the benefit that she or her beneficiary receives." *McCutcheon II*, 62 F.4th at 698; *accord McCutcheon I*, 481 F.Supp.3d at 267-68. In other words, in this Plan, absent the participant's election to receive the benefit at an age less than age 65, the beneficiary steps into the shoes of the participant in the event of a pre-age 65 death. As a result, the use of a PRMD in **any** of the 417(e) calculations—which includes the reduction of the RA from age 65 to payment age— would violate 417(e) because the value of the "make-whole residual annuity," *McCutcheon II*, 62

F.4th at 699, plus the lump sum paid cannot be less than the value of the accrued benefit, determined under 417(e).

As this Court explained: "the total value of the benefit paid cannot be less than the value of the accrued benefit determined using IRC § 417(e). *See* Rev. Rul 89-60; Treas. Reg. § 1.417(e)-1(d); Defs. 6/14/15 Ltr. (Dkt. No. 21-6) at 13-14 Ans. ¶ 57." *McCutcheon I*, 481 F.Supp.3d at 257. If a PRMD were used, this would "result[] in a present value that is less than the corresponding normal retirement benefit and therefore violates 26 C.F.R. § 1.417(e)-1. *See West*, 484 F.3d at 411; *Berger*, 338 F.3d at 764. Therefore, a PRMD should not be applied." *Id.* at 268.

The Second Circuit affirmed this ruling, explaining:

> The RAA functions to remedy the underpayment of lump sums with an additional residual annuity such that the lump sum and residual annuity together ensure compliance with the I.R.C.'s and ERISA's present value requirements. *See* ERISA § 203(a)(2); I.R.C. § 417(e); *see also* 26 C.F.R. § 1.417(e)-1(d)(1)(i) ("The present value of any optional form of benefit cannot be less than the present value of the normal retirement benefit ...."). Because the value of the benefit paid if a member dies before 65 is the same as the Plan's normal retirement benefit, we conclude that Colgate's use of a PRMD to determine the present value of the lump sum when calculating a make-whole residual annuity results in an optional form of benefit that is less than the corresponding normal retirement benefit.

*McCutcheon II*, 62 F.4th at 699.

Mathematically, the only way to satisfy the requirement that "the total value of the benefit paid cannot be less than the value of the accrued benefit determined using IRS § 417(e)," *McCutcheon I*, 481 F.Supp.3d at 257, is if the adjustment of the lump sum between the payment age and age 65 and the adjustment of the RA from age 65 to the payment age are done in the same manner, *i.e.*, without PRMD. Since there is no dispute that the adjustment of the lump sum between the payment age and age 65 cannot be done using PRMD, then neither can the adjustment of the RA from age 65 to the payment age.

11

Defendants suggest that this Court and the Second Circuit only barred use of a PRMD as to the projection and conversion of the prior lump sum to an actuarial equivalent age 65 annuity (the "AE of LS") and not in the adjustment of the age 65 RA to an RA commencing earlier. *See See* Pls. Ex. 1, Defs. 4/21/23 email to Class counsel; Pls. Ex. 2, Defs. 5/11/23 email to Class counsel. Defendants are mistaken.

This Court held: "If a benefit is paid even partially as a lump sum, IRC § 417(e) applies, with the result that the total value of the benefit paid cannot be less than the value of the accrued benefit determined using IRC § 417(e)." *McCutcheon I*, 481 F.Supp.3d at 257. Thus the "total value of the benefit paid," *i.e.*, the lump sum plus the value of the RA on the initial payment date "cannot be less than the value of the accrued benefit," *i.e.*, the present value of the total benefit. Moreover, this Court explained: "Plaintiffs argue that a mortality discount should not be used to determine the present value of a normal retirement annuity when, as prescribed by the Plan, the ultimate benefit paid does not significantly decrease if the participant dies before normal retirement age (*i.e.*, the benefit payable to the beneficiary upon death is not significantly less than what would have been paid to the participant upon survival), as is the case here… This reasoning is persuasive." *McCutcheon I*, 481 F.Supp.3d at 267-68. The conclusion is thus inescapable under this Court's ruling that when determining "the value of the accrued benefit" no PRMD may be used because the value of the immediately payable RA paid cannot be less than the value of the age 65 total accrued benefit, discounted with no PRMD, reduced by the lump sum paid. As illustrated above, the only way for this to mathematically occur is if the age 65 RA conversion to the immediately payable RA is done with no PRMD.

The Second Circuit agreed with this Court's reasoning in affirming and ruled that the present value of the normal retirement benefit must be determined without PRMD. *McCutcheon*

*II*, 62 F.4th at 699.  If the age 65 residual annuity were converted to an immediate lump sum on the original payment date—if, for example, the participants had the option of electing to supplement their legally insufficient account balance lump sum on the original payment date with either a residual annuity or an immediate, supplemental lump sum, there can be no dispute that in order for the "underpayment of lump sums," *McCutcheon II*, 62 F.4th at 699, to be corrected, the lump sum present value of the age 65 residual annuity—that is, the make-up payment expressed as an immediate lump sum—would have to be determined without PRMD.  Further, there can be no dispute that the value of the "underpayment" (determined on the payment date and determined at 417(e) rates) does not change simply because the make-up payment is in the form of an annuity rather than a lump sum (because the entire benefit is subject to 417(e)).  Therefore, the Second Circuit's ruling applies to all adjustments between the current age and age 65, *i.e.*, both the determination of the Age 65 AE of LS and the discount of the age 65 RA into the immediately payable RA.

     Even if Defendants' argument was thus not already specifically precluded, Defendants ignore that the issue has already been decided against them procedurally.  Error 3 was expressly defined in the Complaint as "improperly using survivorship in determining the annuity attributable to the lump sum originally paid **and using a pre-retirement mortality discount ("PRMD") in determining the early retirement factor ("ERF")** to apply to the difference between the annuity attributable to the originally paid lump sum and the annuity payable under Appendix B, C or D."  Dkt. 1 ¶ 102 (emphasis added).  This Court granted Plaintiffs summary judgment on Error 3 on the merits and separately granted Plaintiffs summary judgment on Error 3 because Defendants "failed to oppose" Plaintiffs' motion as to Error 3.  *McCutcheon I*, 481 F.Supp.3d at 267.  The Second Circuit affirmed the District Court's grant of summary judgment

as to Error 3 both on the merits and because "[o]n appeal, Colgate makes no effort to contest the district court's determination regarding its failure to respond." *McCutcheon II*, 62 F.4th at 698 n.23. Obviously, this Court's ruling, affirmed by the Second Circuit, single-handedly torpedos Defendants' attempt to even raise any PRMD argument now.

Defendants' argument that they can apply a PRMD because the RA has no death benefit, *see* Pls. Ex. 2, Defs. 5/11/23 email to Class counsel, is meritless. Under both this Court's and the Second Circuit's ruling, the controlling factor is the death benefit payable ***absent*** the election to receive a lump sum (or lump sum plus residual annuity) prior to age 65: the death benefit payable *once a pre-age 65 benefit has been elected* (either the lump sum or a lump sum plus residual annuity) is completely irrelevant to the issue of whether PRMD is allowed. This can be seen easily by considering two plans: Plan A which matches the Colgate Plan and Plan B which is identical to Plan A in all respects except that there is no pre-retirement death benefit. When determining the lump sum under Plan A, PRMD is prohibited. When determining the lump sum under Plan B, PRMD is allowed (because there is no death benefit). The death benefit in the benefit form paid, *i.e.*, the lump sum, is the same in both plans. This shows that the use of PRMD is not controlled by the benefit form paid (here the RA) but the death benefit payable under the terms of the plan had the benefit *not* been paid.

*McCutcheon II* ruled that "if a plan guarantees survivor benefits that are substantially similar in value to a member's accrued benefit, it is improper to use a PRMD to discount the present value of a future annuity." *McCutcheon II*, 62 F.4th at 698. The logic of this ruling is necessarily based upon the death benefit absent the election to receive the benefit prior to age 65 because once a lump sum of the total benefit is paid, the plan no longer provides ***any*** "survivor benefits" because the lump sum payment relieves the plan of the obligation to pay any

future benefits to anyone whatsoever.  Under Defendants' logic, PRMD would never be prohibited on a lump sum payment of the total benefit, and every case cited by this Court and the Second Circuit was incorrectly decided.  The foundation of Defendants' argument is simply wrong.

\*       \*       \*

Accordingly, the Court directs Defendants to calculate or recalculate, as the case may be, all Residual Annuities for each member of the Class and pay the corrected Residual Annuity as follows:

1) The Accrued Benefit as defined in Section 1.2 is equal to "a monthly annuity for the life of the Member" "commencing at Normal Retirement Age or any later date, which is the Actuarial Equivalent of the Member's Account as of the end of the month coinciding with or immediately following, as the case may be, the determination date."

   a. Age 65 as used here means "Normal Retirement Age or any later date"
   b. Original Payment Date means the first of the month in which the original lump sum was paid.
   c. Per section 1.3 (and based upon the effective date of the 2003 Plan, as discussed above) "For purposes of converting a Member's Account into a single life annuity payable for the life of the Member starting at Normal Retirement Date" the actuarial equivalence is determined using the mortality table in Appendix F with the 20+1% rate, for Class members with an Original Payment Date prior to March 1, 2002, and the Applicable Interest Rate and the Applicable Mortality Table, for Class members with an Original Payment Date on or after March 1, 2002.
   d. The Projection Rate is the 20+1% rate if the Original Payment Date is prior to March 1, 2002 or the Applicable Interest Rate, if the Original Payment Date is on or after March 1, 2002.
   e. The Class member's Age on Original Payment is calculated as the age in completed years and months as of the Original Payment Date (*see* the Spreadsheet attached to Plaintiffs' Expert Report (Dkt. 263), "Calculations" Worksheet ("Plaintiffs' Calculations") Columns R and S).
   f. The Period to age 65 is 65 minus the Age on Original Payment (*see* Plaintiffs' Calculations Column AL).
   g. The Personal Retirement Account ("PRA") is the account as defined in Article 3 of the Plan Document (note that it does not include any employee contributions).
   h. Age 65 Conversion Factor is the factor to convert the account into an annuity using the interest rate and mortality table that would apply to the participant, per c. above, at age 65.

      i. The Accrued Benefit as defined in Section 1.2 = PRA X (1 + Projection Rate) ^ Period to age 65 / Age 65 Conversion Factor.

2) The Appendix C 2.(b)(ii) Benefit is the sum of the Accrued Benefit as defined in Section 1.2 plus any employee contributions made pursuant to Appendix C 2., converted into an age 65 annuity in the same manner as how the PRA is converted into the Accrued Benefit as defined in Section 1.2 (*i.e.*, the same calculations as in 1., but replacing the PRA with the employee contributions).

3) The Offset Amount is equal to the present value of the settlement payment from Colgate I, as of the Original Payment Date, as previously determined by Defendants (*see* Plaintiffs' Calculations Column Q).

4) The Appendix C 2.(b)(i) Benefit is the benefit determined under Appendix C 2.(b)(i), 3.(b)(i), or Appendix D (as applicable) using the same method as Defendants previously used to determine that benefit.

5) The Appendix Benefit (which is referred to in the first paragraph of the RAA as the entitlement under "Appendices B, C or D" and in the second paragraph of the RAA as "the age 65 single life annuity benefit otherwise payable to the Member under Appendices B, C or D, as applicable") is equal to the greater of the Appendix C 2(b)(i) Benefit or the Appendix C 2(b)(ii) Benefit.

6) A participant is only entitled to a Residual Annuity if the Appendix Benefit exceeds the Accrued Benefit as defined in Section 1.2 (*see* RAA, first paragraph).

7) 417(e) Rates means
   a. For Class members with an Original Payment Date prior to January 1, 2000, the PBGC interest rates in effect on the Original Payment Date and the same mortality as in 1) c. above
   b. For Class members with an Original Payment Date after December 31, 1999 and prior to March 1, 2002, the PBGC interest rate in effect on the Original Payment Date and the 83 GAM mortality table (blended 50% male, 50% female) as found in Rev. Rul. 95-6
   c. For Class members with an Original Payment Date on or after March 1, 2002, the same Applicable Interest Rate and Applicable Mortality as in 1) c. above.

8) The 417(e) Discount Factor is the interest only (*i.e.*, with no mortality) discount from age 65 to the Age on Original Payment using the 417(e) Rates.

9) Age 65 417(e) Conversion Factor is the factor to convert an age 65 lump sum into an age 65 annuity using the 417(e) Rates that would apply to the participant.

10) Current Age Conversion Factor is the factor to convert a lump sum at the participant's Age on the Original Payment into an immediate annuity at the participant's Age on Original Payment using the 417(e) Rates.

16

11) The Age 65 AE of LS, referred to in the RAA as "the age 65 single life annuity Actuarial Equivalent amount of the Member's lump sum payment" = (the original lump sum paid + Offset Amount) / 417(e) Discount Factor / Age 65 417(e) Conversion Factor.

12) The Age 65 Residual Annuity = Appendix Benefit – Age 65 AE of LS.

13) Unadjusted Residual Annuity = Age 65 Residual Annuity X Age 65 417(e) Conversion Factor X 417(e) Discount Factor / Current Age Conversion Factor.

14) Residual Annuity is the Unadjusted Residual Annuity, adjusted for participants who were married on the Original Payment Date for payment as a Qualified Joint and 50% Survivor annuity in the same method as previously used by Defendants in 2014.

15) Initial Residual Annuity Correction = Residual Annuity – the Residual Annuity as calculated by Defendants in 2014, prior to any Cost of Living Adjustments.

16) Correction Date is the first day of the month at which the payments of the corrections commence.  Note that the Correction Date may be different for different Class members due to issues such as locating the class member, or arranging how payment will be made.

17) Each Class member (or Class member's beneficiary or estate) will receive a Lump Sum Back Payment Correction, on that participant's Correction Date as a single lump sum payment equal to the sum of

    a. The sum of the Initial Residual Annuity Correction for each month from the Original Payment Date to the earlier of the month preceding the Correction Date or the month of the participant's death, with each payment increased with interest (compounded monthly) from the first day of the month for which the payment is attributable to the Correction date at 5% interest, *i.e.* in the same manner as Defendants determined the amount of back payments in 2014.
    b. For a participant who was married on the original payment date and who died prior to the Correction Date, the sum of 50% of the Initial Residual Annuity Correction for each month from the month following the participants death to the earlier of the month preceding the Correction Date or the month of the spouse's death, with each payment increased with interest (compounded monthly) from the first day of the month for which the payment is attributable to the Correction date at 5% interest, *i.e.* in the same manner as Defendants determined the amount of back payments in 2014.
    c. The sum of the same calculations in a. and b., except the Initial Residual Annuity Correction is replaced by the excess of the Second Residual Annuity Correction over the Initial Residual Annuity Correction, and the Original Payment Date is replaced with August 1, 1996 (note that if the Original Payment Date is after August 1996 then this amount is zero, because the participant would not be entitled to an August 1996 cost of living increase).

    d.  The sum of the same calculations in a. and b., except the Initial Residual Annuity Correction is replaced by the excess of the Third Residual Annuity Correction over the Second Residual Annuity Correction, and the Original Payment Date is replaced with September 1, 2006.

18) Each Class member will receive an annuity (except as provided in c. below) Commencing on the Correction Date, paid as follows:

    a.  If the participant is alive on the Correction Date, then a Residual Annuity equal to the Third Residual Annuity Correction will be paid to the participant at the beginning of each month, until the beginning of the month preceding the participants death (with 50% of that amount continuing to the participants spouse (if any, and if still alive) as of the Original Payment Date until the beginning of the month preceding the spouse's death).

    b.  If the participant is dead, but the participant's spouse (if any) as of the Original Payment Date is still alive, then a Residual Annuity equal to 50% of the Third Residual Annuity Correction will be paid to the participant's spouse at the beginning of each month, until the beginning of the month preceding the participant's spouse's death.

    c.  If both the participant and the participant's spouse (if any) are dead, then no monthly residual annuity will be payable.

19) Solely for purposes of determining the value of the total corrections, that value will equal the sum of

    a.  The Lump Sum Back Payment Correction, for all Class members plus

    b.  The value of future Residual Annuity payments, for all Class members valued using 5% interest and the static mortality table for annuitants as published by the IRS to be used for purposes of IRC Section 430.

    c.  For purposes of this calculation only, the Correction Date will be treated as the date as of which final judgment has been entered, all appeals exhausted and all matters resolved other than the actual payment of benefits and attorney's fees.

20) The above calculations will be performed not only for the participants included in the 2014 calculations provided to Plaintiffs by Defendants, but also for all participants who were participants in the Plan on January 1, 1989, who received a lump sum payment prior to entry of the final judgment and were not included in the 2014 calculations (note that even participants who were paid a Residual Annuity prior to 2014 (*i.e.*, were originally paid a lump sum after 2005) would receive a correction under Count II Error 3).

In accordance with the Court's prior orders, *see* Dkt. 284 at 27; Dkt. 286, the relief provided in this Order and Revised Final Judgment is stayed until appellate remedies have been exhausted. The obligation to file for attorneys' fees and expenses and notify the Class is likewise stayed until that time and further order of the Court. *See* Dkt. 286.

The Clerk of Court is respectfully directed to close the motion.

Dated: July __, 2023
      New York, New York

                                                                           LORNA G. SCHOFIELD
                                                               United States District Judge